**230 BOXES, MORE OR LESS, OF FISH et al. v. UNITED STATES.**

No. 10624.

Circuit Court of Appeals, Sixth Circuit.

May 24, 1948.

John C. Ray, of Detroit, Mich. (John C. Ray, of Detroit, Mich., on the brief), for appellants.

Leonard D. Hardy, of Washington, D. C., and Joseph L. Bannigan, of Detroit, Mich. (Leonard D. Hardy, and T. Vincent Quinn, both of Washington, D. C., Thomas P. Thornton, Joseph L. Bannigan and Kenneth W. Smith, all of Detroit, Mich., on the brief), for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The claimant, J. Kozloff Fish Distributors, has appealed from a decree of condemnation of fish, admittedly infested with parasitic worms, seized under libels of information filed in the United States District Court for the Eastern District of Michigan pursuant to section 334(a), Title 21 U.S.-C.A., of the Federal Food, Drug, and Cosmetic Act, June 25, 1938, c. 675, § 304, 52 Stat. 1044.

The articles of food seized were transported in four separate shipments from Winnipeg, Manitoba, Canada, to Detroit, Michigan; and before the libels were filed, had been admitted into this country and delivered to the consignee at Detroit by the Bureau of Customs of the Treasury Department, after having been released by the Food and Drug Administration acting in accordance with section 381, Title 21 U.S.C.A., and the regulations promulgated thereunder.

After the articles of food had been admitted into the United States and while in possession of the consignee or its agent at a warehouse in Detroit, the United States Customs Service rechecked the importations to ascertain whether the Tariff Laws of the United States had been complied with; and, after rechecking, took no proceedings in the matter to disturb the original entry. Simultaneously, however, the Food and Drug Administration, through inspectors, reexamined the fish and found them to be adulterated within the meaning of section 342(a)(3), Title 21 U.S.C.A., in that the the articles of food consisted wholly or partly of a filthy substance by reason of the presence therein of parasitic worms.

Concededly, the infestation of the fish was not due to decomposition, or to any act of negligence of the claimant, but was caused by the presence of parasites in the Canadian Lakes from which the fish were taken. It follows, therefore, that the fish were infested prior to their shipment from Winnipeg, Canada, to Detroit, Michigan. Parasital infestation in fish, not being visible externally, can be determined only by internal examination of the fish. The adulterated articles of food are now in the custody of the United States Marshal in their original unbroken packages.

The foregoing findings of fact of the district court are in conformity with an agreed statement of the parties submitted in lieu of a record. The question which we must answer is whether, in the circumstances of the case, section 304(a) of the Federal

Food, Drug and Cosmetic Act,[1] sec. 334(a), Title 21 U.S.C.A. authorizes the seizure and condemnation of the articles of food.

The appellant contends that (1) the shipments of fish from Winnipeg, Manitoba, Canada, to Detroit, Michigan, were shipments in foreign and not in interstate commerce; (2) the fish were not adulterated in interstate commerce; (3) Customs entry of the fish with the approval of the Food and Drug administration did not make the shipment interstate commerce within the meaning of Title 21, U.S.C.A. § 334(a); and (4) the shipments, at the time of seizure, being still at the port of entry in the original containers continued to be "imports" within the meaning of section 381, Title 21 U.S.-C.A.

■ The plain words of the statute reject the first contention of appellant. Section 201(b) of the Act thus defines interstate commerce: "The term 'interstate commerce' means (1) commerce between any State or Territory *and any place outside thereof,* and (2) commerce within the District of Columbia or within any other Territory not organized with a legislative body." Section 321(b), Title 21 U.S.C.A. [Italics supplied.]

No force is found in the argument that despite the words of the statute the definition should be restricted, as asserted by appellant, to the "traditional meaning of 'interstate commerce,' i. e., commerce among the several states." If Congress intended to limit the coverage of "interstate commerce" exclusively to "commerce between the several states," why were the words "commerce between any State or Territory and any place outside thereof" written into the statute? No definition of any type of commerce other than interstate commerce is embraced in the Act. The term "foreign commerce" is not defined or used.

In some Acts of Congress, "interstate commerce" has been given a narrow definition: in others, a broad one. No uniform pattern is discernable, but each Act has been so drafted by the Congress as to accomplish the particular purpose desired. For examples of divergency, see National Fire Arms Act of June 26, 1934, U.S.C.A., Title 26, U.S.C.A.Int.Rev.Code, § 2733(g), for narrow definition; and for broad definitions, see Securities Act of 1933, Title 15, U.S.C.A., § 77b(7); Securities Exchange Act of 1934, Title 15, U.S.C.A., § 78c(17); Commodity Exchange Act, as amended in 1936, Title 7, U.S.C.A., § 2. The definition of "interstate commerce" in the last cited Act bears close similarity to that given in the Federal Food, Drug, and Cosmetic Act, in that the following language is employed: "Commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; * * *."

The argument of appellant receives no added weight by reference to the Federal Caustic Poison Act of 1927, Title 15, U.S.-C.A., §§ 401, 402(3)(c); The Filled Milk Act of 1923, Title 21, U.S.C.A., §§ 61, 62· The Meat Inspection Act of 1907, Title 21, U.S.C.A., § 71 et seq.; The Horse Meat Act of 1919, Title 21, U.S.C.A. § 96; The Virus, Serum, Toxin Act of July 1, 1902, Title 21, U.S.C.A., §§ 151–158; The Federal Insecticide, Fungicide and Rodenticide Act of June 25, 1947, Title 7, U.S.C.A., § 121 et seq. None of these statutes is inconsistent with an interpretation of the Federal Food, Drug and Cosmetic Act as meaning that commerce between a State and "any place outside thereof" includes imported articles of food. The many different definitions of "interstate commerce" in Acts of Congress impel the conclusion that each definition must be received and applied in compliance with the language of the particular Act. See Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 521, 62 S.Ct. 1116, 86 L.Ed. 1638; Walling v. Jacksonville Paper Co., 317 U.S. 564, 569, 63 S.Ct. 332, 87 L.Ed. 460.

■ We need scarcely pause to comment that there is no merit in the second contention of appellant that the infested fish shipped from Winnipeg to Detroit were not adulterated in "interstate commerce," as

---

[1] "Any article of food * * * that is adulterated or misbranded when introduced into or while in interstate commerce * * * shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found. * * *"

alleged in the libels. Indisputably, the fish were adulterated by parasitic worm infestation when they were captured in the Canadian Lakes; they were so adulterated "when introduced into" interstate commerce; and were, of course, infested "while in interstate commerce." They were, therefore, within the plain coverage of the Act. Cf. Seven Cases of Eckman's Alterative v. United States of America, 239 U.S. 510, 518, 36 S.Ct. 190, 60 L.Ed. 411, L.R.A.1916D, 164.

The last two contentions of appellant intertwine and are appropriately discussed together. The basis of the argument seems to rest upon insistence that the provisions of sub-chapter VIII—Imports and Exports—Title 21, U.S.C.A., § 381, are "superior" to the first seven sub-chapters of the Act in relation to foreign commerce; and that the background of the existing Act of 1938 revealed in the Food and Drugs Act of 1906, 21 U.S.C.A. § 1 et seq., taken with the legislative history of the existing enactment, supports an inference that Congress intended to provide special preference for "citizen importers" and "foreign exporters" by "excluding their commerce from the harshness of procedures provided against interstate commerce." It is urged that, while not entitled to possession of the articles of food for sale in the United States, claimant does have the right to export the fish to Canada, pursuant to the provisions of section 381.[2]

■ We perceive no logical reason, either from the provisions of the Act itself or from its legislative history, for the assumption that sub-chapter VIII possesses superiority over the first seven sub-chapters of the Act. Nor does there seem to be any inconsistency between the seizure provisions of section 334(a) of Title 21 U.S.C.A., and the import-export provisions of section 801, 21 U.S.C.A. § 381, such as to preclude seizure of the shipments of fish in the lawful manner pursued in the instant case.

■ The Government concedes that section 801, 21 U.S.C.A. § 381, provides a special remedy, restricted to imports and exclusive for such time as the imported article remains in Customs' custody; but it is insisted here, and the district court so concluded, that the articles of food had been released from Customs' custody and were, thereupon, subject immediately to condemnation on libel of information pursuant to the provisions of Title 21 U.S.C.A. § 334. The Secretary of the Treasury, with the approval of the Federal Security Administrator, had unconditionally admitted the shipments into the United States. The reasonable interpretation would seem to be that section 801 is designed to test the right to admission before an article may be brought into the United States; and that section 334(a) of Title 21 U.S.C.A., is operative after the article is released from Customs and admitted into this country. Cf. United States v. Nine Barrels of Olives, D.C.Pa., 179 F. 983.

■ From a study of the legislative history of the Federal Food, Drug and Cosmetic Act, we find no justification for

---

[2] "The Secretary of the Treasury shall deliver to the Federal Security Administrator, upon his request, samples of food, * * * which are being imported or offered for import into the United States, giving notice thereof to the owner or consignee, who may appear before the Federal Security Administrator and have the right to introduce testimony. If it appears from the examination of such samples or otherwise that * * * (3) such article is adulterated, misbranded, or in violation of section 355, then such article shall be refused admission. * * *" [21 U.S.C.A. § 381(a)].

"The Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any such article refused admission, unless such article is exported by the consignee within three months from the date of notice of such refusal, under such regulations as the Secretary of the Treasury may prescribe: *Provided,* That the Secretary of the Treasury may deliver to the consignee any such article pending examination and decision in the matter on execution of a bond as liquidated damages for the amount of the full invoice value thereof together with the duty thereon and on refusing for any cause to return such article or any part thereof to the custody of the Secretary of the Treasury when demanded for the purpose of excluding it from the country or for any other purpose, such consignee shall forfeit the full amount of the bond as liquidated damages." [21 U.S.C.A. § 381(b)].

the argument that imports were not intended to be considered as shipments in interstate commerce. The Act of 1906, in Title 21, U.S.C.A. § 14, provided for seizure of an adulterated or misbranded article "if it be imported from a foreign country for sale." The present law does not contain this specific language; but provides, as heretofor stated, that the term "interstate commerce" means, inter alia, "commerce between any State or Territory and any place outside thereof" and, therefore, subjects an imported article to the condemnation procedure of Title 21 U.S.C.A. § 334(a), as effectually as did the original Act. Obviously the Congress considered that no substantial change with respect to interstate commerce coverage was being wrought by the subsequent enactment of 1938. See S.Rep. No. 493, 73rd Cong., 2d Sess., page 19, accompanying S. 2800; S.Rep. No. 361, 74th Cong. 1st Sess., accompanying S. 5; H.Rep. No. 2139, 75th Cong., 3d Sess., p. 4 [referring to the present section 334(a) of Title 21 U.S.C.A.]. It should be observed that H. R. Rep. 2139, 75th Cong., 3d Sess., p. 13, expressly states that section 801 relates to imports and contains no substantial change from the provisions of the then existing law.

■ The legislative history does not support the insistence that citizen importers and foreign exporters were to be afforded any special privilege through restriction upon the seizure provisions of the Federal Food, Drug and Cosmetic Act. Indeed, it is manifest that one of the main purposes in the repeal of the Act of 1906 and the substitution therefor of the Act of 1938 was to enlarge the protection of the public from adulterated foods. In the report of the Senate Committee on Commerce upon S. 5, a draft very similar to the bill as enacted, it was stated: "This bill has been prepared with three basic principles in mind: First, it must not weaken the existing law; second, it must strengthen and extend that law's protection of the consumer; and third, it must impose on honest industrial enterprise no hardship which is unnecessary or unjustified in the public interest." S.Rep. No. 91, 75th Cong., 1st Sess.

The Supreme Court of the United States has said: "The Food and Drugs Act of 1906 was an exertion by Congress of its power to keep impure and adulterated food and drugs out of the channels of commerce. By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48.

An opinion of the United States Court of Customs and Patent Appeals announced January 7, 1947, while relating only to the recovery of customs' duties upon a shipment of fish from Canada to the United States, is of some interpretative significance here. Presiding Judge Garrett stated: "We think section 558 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 [19 U.S.C.A. § 1558], and section 381(a) and (b) [Sec. 801(a) and (b) Federal Food, Drug and Cosmetic Act] must, in cases such as this, be construed pari passu and that both must be given force and effect in determining whether there has been a release of merchandise from the 'custody of the government.'" United States v. W. F. Mackay, 34 C.C.P.A., Customs, 127, 133, 134.

■ After an imported article has passed from the control of the Customs officials and has been released and delivered to the consignee, no authority under federal law or customs' regulations is found to authorize the Secretary of the Treasury to seize such imports except in cases where fraud was involved in their entry, as for instance in Origet v. United States, 125 U.S. 240, 8 S.Ct. 846, 31 L.Ed. 743. Cf. United States v. One Diamond Ring, D.C., 2 F. 2d 732. The instant case involves no issue of fraud in the importation of the adulterated food articles. The Secretary of

the Treasury and the Federal Security Administrator had completed the performance of the duties imposed upon them by section 801 of the Act. When this point had been reached, the Food and Drug Administration took action by filing libels of information upon which the shipments of infested fish were seized where warehoused by the claimant. We conclude, as the district court did, that the articles of food so seized were subject to lawful condemnation in the manner pursued by due processes in conformity with the statute.

The decree of condemnation entered in the district court, is, therefore, affirmed.