Clifford L. DUKE, Jr., Louis Glenn Ballard and Vic Buono,

v.

UNITED STATES of America, Appellee.

No. 15146.

United States Court of Appeals Ninth Circuit.

Jan. 7, 1958.

Writ of Certiorari Denied June 16, 1958.

See 78 S.Ct. 1361.

George W. Rutherford, La Jolla, Cal., Clinton F. Jones, Escondido, Cal., Barton C. Sheela, Jr., Richard L. Vaughn, Edgar G. Langford, Thomas Whelan, San Diego, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Manley J. Bowler, Thomas Ludlow, Jr., Harry D. Steward, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, Chief Judge, LEMMON and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

This is a criminal case in which there was laid bare a tremendous traffic in the smuggling of psittacine birds into the United States from the Republic of Mexico. Irrespective of the merits, it is a sordid story of intrigue, double-dealing and feuds among the participants, with treacherous interludes and escapades.

Parrots, parakeets and, broadly speaking, any bird with a hooked beak are denominated psittacine birds. There is a quarantine against the importation of such fowl into the United States.[1] However, there appears to be a vast importation of these birds here. It is not the custom in this commerce to pay any duties on psittacines. Indeed, it would appear from the record that there is no known instance of such an impost having been paid.

In general, the participants in this traffic were as malodorous as the commerce therein itself. The testimony was furnished by co-laborers in the vineyard, who were characterized by one of the defendants as:

"John W. Hadzima, a twice convicted smuggler, Nicholas A. Spicuzza, a twice convicted smuggler, George Todd, a twice convicted smuggler, Raymond Curtis, convicted smuggler, Robert Helm, convicted smuggler, Mary Asconi, admitted handler of psittacine birds known by her to have been smuggled."

The indictment was in ten counts. Three separate conspiracies were charged (in Counts I, IV and VII). Five counts charged smuggling (II, V, VIII, IX and X). Two counts charged certain defendants with knowingly receiving, concealing and facilitating the transportation and concealment of certain birds after illegal importation (III and VI).

Appellants Duke, Ballard and Buono, having been convicted on certain counts by a jury, appeal.

All of these appellants raise the point that the convictions under 18 U.S.C.A. § 545,[2] the general smuggling

---

1. See 42 C.F.R. § 71.152(b), promulgated under authority of 42 U.S.C.A. § 264.

2. "Smuggling goods into the United States
   "Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

statute for felony, cannot stand because the Surgeon General, under authority of 42 U.S.C.A. § 264, passed a health and safety regulation forbidding, with minor exceptions, importation of psittacine birds. See 42 C.F.R. § 71.152(b). This regulation carries a penalty for a misdemeanor. 42 U.S.C.A. § 271(a). The same argument is applied to 18 U.S.C.A. §§ 42 and 43. But these contentions have no validity. Appellants may have committed two crimes, one a misdemeanor and the other a felony. See Steiner v. United States, 9 Cir., 229 F.2d 745, certiorari denied sub nom Hadzima v. U. S., 351 U.S. 953, 76 S.Ct. 847, 100 L.Ed. 1476. If there is any conflict between the statute and the regulation, the former prevails. See Murray v. United States, 9 Cir., 217 F.2d 583; Callahan v. United States, 285 U.S. 515, 52 S.Ct. 454, 76 L.Ed. 914. The case of Berra v. United States, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013, has no pertinency upon this point. Where different proof is required for each offense, a single act or transaction may violate more than one criminal statute. United States v. Beacon Brass Co., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61; United States v. Noveck, 273 U.S. 202, 47 S.Ct. 341, 71 L.Ed. 610.

■ It is argued that psittacine birds are not merchandise which should have been invoiced under the customs laws. But this has no validity. Steiner v. United States, supra. In that connection, it is urged that the substantive counts are defective because they were insufficient to charge that appellants violated 18 U.S.C.A. § 545, by failing to comply with 19 U.S.C.A. §§ 1461 and 1484. This latter point has no apparent connection with any count except those relating to receiving and facilitating. See Babb v. United States, 5 Cir., 218 F.2d 538. As to the latter counts, the indictment there contained the statement that the importation was contrary to 19 U.S.C.A. ch. 4, and particularly to §§ 1461 and 1481 thereof.

Duke, who is a lawyer, complains of his representation before the court. Under the circumstances, the complaint is of very little moment. He seems to have hoped, by complicating the situation, he could gain some advantage at the trial. Since that failed, he now attempts to use the situation he created as error to obtain reversal upon appeal. There is nothing more revolting in the American courts than the attempt of lawyers, as criminals, to use the guaranties set up for fair trial as technicalities to shield them from just conviction. The record in this case shows clearly that Duke is guilty. He has been convicted by a jury. Nevertheless, if the constitutional rights of Duke were violated, this Court must give him redress.

■ There are two principles which are founded on reason and authority in this field to which this Court gives full weight. First, an accused has an unquestioned right to defend himself.[3] Second, an accused should never have counsel not of his choice forced upon him.[4] This Court has never failed to recognize either of these fundamental rights.

---

"Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

"Shall be fined not more than $5,000 or imprisoned not more than two years, or both.

"Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

"Merchandise introduced into the United States in violation of this section shall be forfeited to the United States." 18 U.S.C.A. § 545.

3. "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel * * *." 28 U.S.C.A. § 1654.

4. "The Constitution does not force a lawyer upon a defendant." Adams v. United States, 317 U.S. 269, 279, 63 S. Ct. 236, 242, 87 L.Ed. 268.

As we review the record as to representation by counsel or in propria persona, it is clear that the confusion was caused by Duke and Duke alone. He acquiesced and consented to limitations on his right to represent himself. He attempted to repudiate the limitations subsequently, but that circumstance cannot vitiate his previous waiver. If defendant were an ignorant and untutored person, there might be some force to his present claim. But Duke is a trial lawyer of long experience.

Duke, at the hearing for arraignment and plea before a judge other than the one who tried the case, asked permission to proceed in propria persona for preliminary motions pertaining to the attack on the indictment. He represented to the judge at the time that counsel would appear for him at trial. Permission was granted.

Afterward, in apparent pursuance of this suggestion, Duke presented a Mr. Fitzgerald, a competent attorney, to the judge who eventually tried the case. However, at an informal colloquy in chambers, Duke indicated he wished Mr. Fitzgerald as an associate. The trial judge agreed that another lawyer should be in the case and suggested that Duke should not testify and also attempt to argue the case to the jury. Whatever may be thought of the legal basis of this idea, Duke fully agreed with the underlying practice and consistently held to that position throughout the trial.[5] The thesis of the trial court was apparently that Duke, if acting as client and lawyer, would be involved emotionally and prejudice his own case.[6] After a great deal of discussion, in which Duke, Fitzgerald and the trial judge participated, all were in agreement.

In open court, before the jury had been empaneled, Duke moved for the entry of Mr. Fitzgerald as co-counsel, and thus sought to impose a dilemma upon the trial judge. But the judge made his position clear that Duke could appear in proper person subject to limitations to which Duke had agreed, or he could appear through counsel. As a result, Mr. Fitzgerald, who was of Duke's own choosing, entered the case as counsel for Duke. At the insistence of Duke, however, the latter was allowed, by the discretion of the court, certain personal participation such as examination of witnesses and making and arguing motions to the court. Parenthetically, the trial court was extremely fair in permitting Duke all the privileges agreed upon. Nothing was said about an opening address to the jury by Duke. Both Mr. Fitzgerald and Duke apparently agreed that the participation of Duke would be so limited, for the trial judge had made it abundantly clear that Mr. Fitzgerald was to have full control of the cause. When he accepted Fitzgerald as counsel subject to his personal participation only as permitted by the court, Duke made an election of record in open court.

After the jury was empaneled and before taking of testimony, the court again sought to clarify the status of Duke, so that there would be no confusion about his participation. It was pointed out that the obligation of Duke was to appear in propria persona or be represented by counsel, but that he did not have a right to a hybrid of the two.[7]

5. At one point he said: I didn't * * * —please of the court, I had never intended to argue the case. I realize the rule, that having testified myself, I wouldn't be permitted to argue nor would it be wise for me to argue my own testimony or any of the testimony. And I realize my own emotional feelings in the case.

6. The judge expressed himself as follows: "The Court: Now, he being necessarily involved as a man would, emotionally in the problem, it is just not a good thing for him to be participating as an attorney in the courtroom. You know, Mr. Fitzgerald, how many times a lawyer will say or do things which will militate very strongly against him when he acts under the stress of emotion.
"Mr. Fitzgerald: Yes.
"The Court: How much more he is apt to do that if he is both client and lawyer? I don't think it is practical."

7. This is a correct statement of the law. See Shelton v. United States, 5 Cir., 205 F.2d 806, 812–813.

However, the court reiterated its decision to permit Duke limited participation with his counsel. The court reserved all arguments of fact and the opening statement to the jury on behalf of Duke to Mr. Fitzgerald.

At this point, Duke for the first time insisted upon the right to make an opening statement, but the court ruled that Mr. Fitzgerald was to make this presentation. Duke claimed Mr. Fitzgerald was unprepared. The court then called attention to the fact that Duke had been under indictment for months and had made no appropriate attempts to settle the question of representation until the time of trial.

The trial judge offered to recess the case until Mr. Fitzgerald could prepare himself with the assistance of Duke to make the opening statement. The court said:

> "I know academically you are educated, Mr. Fitzgerald, but as to the facts, if you are not well prepared, you proceed last and I will see there is ample recess so that Mr. Duke can write it out if he wants."

Duke refused this offer.

Duke then moved to have Mr. Fitzgerald released from the case. The court denied this motion.[8] Mr. Whelan, attorney for Ballard, made the opening statement for Duke, with the consent of the latter.

■ Duke was not denied the right to represent himself. Counsel was not forced upon him. Mr. Fitzgerald was counsel of Duke's own choosing. Duke consented to have Mr. Fitzgerald represent him, with limitations upon his own presentation. The court was not in error in refusing to permit Duke to repudiate his agreement to the arrangement. Any right Duke had was waived by his conduct and his informed consent.

Although there are expressions which, taken out of context, might indicate that Duke wished to try the case in propria persona, he never at any time unqualifiedly took that position. His duty was to have refused to proceed otherwise if he wished to raise the point here.

Although Duke now attempts himself to escape therefrom, the trial of the case was permeated by his charge that the prosecution was the result of plot or conspiracy by certain public officials, in conjunction with organized labor, to frame Duke on the charges in the instant case. If it can be believed that these statements and innuendoes were not made in the first instance by Duke himself, at any rate these were specifically adopted[9]

---

"The cases cited * * * stress * * the right of an accused to act for himself and his right to have a lawyer assigned in his behalf. * * * Obviously, however, those rights cannot be both exercised at the same time." United States v. Mitchell, 2 Cir., 137 F.2d 1006, 1010.

8. It should be noted all these proceedings were out of the presence of the jury.

9. "The Court: * * * ' * * * But the reason those witnesses came forth and told what, to our defense contention is a trumped up story against us, is that a certain group of persons, Sankary, Hannah, Vader, Steward, some labor unions operating in this county, the Customs Service, the United States Attorneys office'—I don't know if I have enumerated them all—'have combined together'—and I think Judge Solomon—'to induce these witnesses, who have testified for the government, to tell a false story or series of false stories in order to wreak the private vengeance of Vader, Sankary, Steward, and so on, against these particular defendants.'

"Now, I don't think it is claimed that Judge Solomon was personally out to get these particular defendants, but Judge Solomon is said to be going along with the plan and scheme, and the labor unions, Mr. Sankary, Mr. Steward, Mr. Vader, who are out to establish a trumped up false case against these defendants. * * *

"Now, is that right, Mr. Duke?"

"Mr. Duke: That is our defense, your Honor. That is my defense. However, I think your Honor has included persons in your enumeration of people, that were a part of the scheme, that I do not contend that were a part of it." (Emphasis supplied.)

It is unnecessary to prolong the excerpt to show that Duke claims to have

by him while on trial. Among those supposed to be assisting in the combination to frame him were included a federal judge who tried a companion case and members of the staff of the United States Attorney conducting previous prosecutions as well as the prosecution of the instant case. The trial court may well have taken the whole situation into consideration in his rulings upon the question of representation. There have been examples of split representation whereby a lawyer defendant was enabled to use associate counsel as a shield while he engaged in offensive tactics himself. We see no reason why the trial court should have been compelled to allow Duke to turn this proceeding into a Roman holiday, with the other defendants and government witnesses and the public officials as the victims. The trial court was perfectly correct in maintaining firm control of his courtroom and of the proceedings therein. In this aspect of the cause at the outset of the trial, the trial court was not bound to allow Duke to use his position as defendant as a launching ground for missiles, even if as a lawyer he believed his best defense was the familiar one of trying the prosecutors and witnesses for the prosecution.

■ This situation was thereafter further complicated when the supposed "special defense" of conspiracy of the officials and others fell flat.[10] Mr. Fitzgerald repudiated it. Now Duke assigns as error the trial of the issue by attempting to place the blame upon Mr. Fitzgerald, who, he said, misunderstood the defense on account of lack of preparation and unfamiliarity with the case. Duke also assigns as error that the trial court permitted extraneous issues to seep into the case to his prejudice. The record has been carefully reviewed. This Court finds Duke, and Duke alone, responsible for the introduction and trial

of these charges and that he attempted to shift the burden thereof only when it was obvious the introduction was deleterious and not helpful to his cause.

■ There are other matters of no merit raised by Duke. (1) He complains that the witness, Sankary, was put on the stand by the government and asked only whether he had been subpoenaed by the defense. The defense did not call the witness. (2) Duke was asked an impeaching question upon cross-examination. It was not followed up by testimony supporting the statement which he purportedly made. Sankary was one of the persons purported to have heard the statement by Duke. No objection was made at any time during the trial to either of these matters. There was no error.

■ Duke assigns as error certain argument by the prosecution calling attention to the absence of evidence to support the "special defense" of conspiracy by government officials and others. There was no objection at the time. When Duke referred to the matter at a subsequent time, the court ruled Duke had invited the comment. This was correct.

Exception was taken generally to the fact that the court commented upon the charge that certain government witnesses had in effect conspired together to tell false stories. The general effect of the comment was that the situation of the witnesses should be considered, especially as to what access and lack of access they had. It was said persons in the penitentiary are under some restraint and some degree of unavailability to others, but there are extents of availability. The jury were told to analyze the testimony and to determine whether they could believe all or any part of it. Some of the witnesses had been in the penitentiary.

It is obvious that the court was directing, as it had a right to do, the jury to

---

modified the position as to certain of the persons named and suggested that the Federal Bureau of Investigation was misled and the United States Attorney was unwittingly a party.

10. The caution of the trial judge in the first colloquy, that, if Duke personally participated to a great extent, he might prejudice his case, seems to have been fulfilled."

analyze the testimony and calling attention to some special circumstances in relation to the situation of these witnesses. The judge likewise admonished the jury that they were the judges of the facts and the credibility of the witnesses and they had the right to disregard entirely any comment of his.

The power of a trial judge in the federal court to comment fairly to the jury, if he leave to them the final decision and the power to disregard his remarks, has never been denied. The only question ever raised is whether he has abused his authority. The trial judge here commented fairly and regarded the appropriate restrictions.

The court admitted the record of a telephone conversation held during the progress of the trial between Duke and Buono, both defendants on one side, the government witness Hadzima, on the other. The recording was made by Duke. The trial record is confused, but Duke is apparently now claiming that he was prevented from cross-examining Hadzima as to the conversation. He also claims the conversation tended to prove a conspiracy against him. The ruling of the court gave him everything to which he was entitled, since the jury had the whole record and were entitled to judge thereby the credibility of this witness. The conversation did not tend to establish a conspiracy to convict Duke.

There was no error in the refusal of the court to permit a witness to testify that during a certain period Duke was heavily in debt and had to borrow from the bank to meet current operating expenses. The purpose was to rebut testimony of Hadzima that he had paid Duke during this same period fabulous sums of money.

Likewise, the court refused to allow Duke to show that Helm, a government witness, had, immediately prior to trial, engaged in collateral illegal conduct for which he had not been prosecuted. This was not error.

The trial court permitted Hadzima, a government witness, to have advice of private counsel while testifying. It must be said this is an extremely dangerous practice. There is some authority that it is within the discretion of the trial court. But, if a witness must have such advice during his testimony, the government had better not call him. The witness, upon advice of counsel, claimed the protection of the Fifth Amendment on certain questions, upon one of which the court ruled that he was so entitled. Upon another question, the court ruled that certain phases were within the scope of his previous testimony, and required the witness to answer, but limited the question in other respects. Upon advice of his attorney, Hadzima corrected a former statement and revealed that he had been told that the prosecution of a different case would be dropped if Hadzima testified for the government in the instant case. This admission supported the theory of Duke and redounded to his benefit. He thus elicited, upon cross-examination, an interest or motive which might indicate bias after the witness had flatly denied such a fact on direct.

We entirely disapprove of the practice of any witness in a criminal case, especially a government witness, receiving secret advice from anyone while he is on the stand. It is a destructive precedent. But, in the present case, it obviously did not harm Duke, but helped him. The error was not prejudicial.

The trial court refused to give a requested instruction of defendant to the effect that, if it were within the power of the government to produce stronger and more satisfactory evidence, and they failed to do so, the inference is that such evidence would be unfavorable to the government. The request was improper. A correct instruction would apply to either party, even in a criminal case. The balance of the requested instruction, that the burden of proof was upon the government, was adequately covered and completely clear from the instruction given by the court.

The court gave an instruction at length to the effect that the uncor-

roborated testimony of an accomplice or co-conspirator is to be scrutinized and accepted with caution. Duke contends that the court should have instructed that "a conviction may not be had solely on the testimony of accomplices unless such testimony be corroborated by other evidence." This latter is not the rule in the federal courts. There was no error in the instructions given.

■■■ Defendant Ballard was denied a bill of particulars because it was not clear who was actually to smuggle the birds into the United States and in what manner Ballard participated in the conspiracy and the various acts, and because it is not alleged who did the various physical acts. It is plain this was an attempt to have the evidence of the government disclosed before trial. The matter was in the discretion of the trial court, and this discretion was not abused.

■ It is likewise in the sound discretion of the trial judge to say whether defendants should be tried separately or together. Ballard was charged by only three of the ten counts. He claims he was prejudiced by denial of a motion for severance. The record shows there was nothing improper in trying all defendants together.

The court gave an instruction on alibi, at the request of counsel for Ballard. If there were any just criticism of the original instruction of the court as to alibi, it was thus corrected.

■ Evidence was admitted in rebuttal, which Ballard says was admissible in chief. This indicates there was no error. The trial court has discretion as to order of proof, and the evidence was admittedly competent. No prejudice was shown.

Buono raises the point that the counts of the indictment, I, IV and VII, charge three separate conspiracies. Several persons, including some defendants, were accused of membership in each of these conspiracies, each of which related to the traffic in psittacine birds. Buono was charged by counts IV and VII, respectively, of membership in two of such con-spiracies. He was acquitted on count IV, but convicted on count VII. He claims he was a victim of a mass trial. He further contends that there was only one conspiracy and that it is error to break the charge into three.

■■ Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, is an example of the mass trial of several conspiracies under an indictment charging only one. As such, the convictions were set aside. But it needs no argument to prove that the reverse of this situation is unfair. If there were a conspiracy which continued over a long period of time and different persons were involved in different phases, it would not be improper to charge those in one phase with one conspiracy and use a separate count to charge all those in a different phase as co-conspirators in such different phase.

Instead of militating against the conclusion that this procedure was fair as to Buono, his acquittal on one conspiracy count and his conviction on another support it. For, if the indictment had been in only one count for one conspiracy, Buono would have been convicted of participation in the whole integrated conspiracy. That conviction would illustrate the danger of a mass trial. But here the jury discriminated. He was found guilty of that phase in which the jury found he participated and acquitted of conspiracy on other phases. Even though Buono could demonstrate that, considered from the standpoint of pure logic, splitting into several counts an integrated conspiracy was technically incorrect, he did not suffer injustice thereby.

The record as a whole demonstrates beyond possibility of doubt the guilt of each defendant of the crimes of which the jury convicted him. Furthermore, there is demonstrated a widespread, persistent and defiant combination to treat the criminal law as if it did not exist. Repeated convictions did not deter these felons. Humanitarian release on bail was capitalized by effecting new combinations and commission of other crimes. The record demonstrates that

easy release on bail of hardened male-factors after conviction breeds contempt of law and sardonic patronage of judges.

 The trial as a whole was fair and impartial. Each defendant was demonstrably guilty. No record in any criminal case is so perfect that an astute lawyer cannot suggest possibility of error. Any error in this record was not prejudicial to any defendant. As has been shown, there was none of consequence.

Affirmed.