**Bernard ROSEMAN and Bernard Copley, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 19636.**

United States Court of Appeals Ninth Circuit.

July 20, 1966.

As Modified on Denial of Rehearing Aug. 24, 1966.

William C. Wunsch, of Faulkner, Sheehan & Wiseman, San Francisco, Cal., for appellant Roseman.

Luke McKissack, Los Angeles, Cal., Jerome Berg, San Francisco, Cal., for appellant Copley.

Cecil F. Poole, U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., Arthur A. Dickerman, Atty., Dept. of Health, Education and Welfare, Los Angeles, Cal., for appellee.

Before HAMLIN, MERRILL and DUNIWAY, Circuit Judges.

HAMLIN, Circuit Judge.

Bernard Roseman and Bernard Copley, hereinafter appellants, were charged in a nine-count indictment in the United States District Court for the Northern District of California, Southern Division, with violating 18 U.S.C. § 545, the conspiracy statute, and various sections of the Federal Food, Drug and Cosmetic Act, arising out of certain activities of the appellants concerning the drug LSD.

Counts 1 and 2 charge appellants with concealing, selling, and facilitating the transportation, concealment, and sale of LSD which the appellants knew had been imported into the United States contrary

to law.[1] Counts 3 through 8 charge appellants with selling and holding for sale LSD which had been mislabeled, misbranded or unlabeled in violation of the Federal Food, Drug and Cosmetic Act.[2] Count 9 charged appellants with conspiracy to violate the Federal Food, Drug and Cosmetic Act.[3]

After a waiver of jury, appellants were tried before the United States District Court. They were found guilty on all nine counts. A timely motion for a new trial was denied and appellants were sentenced as provided by law.[4] A timely appeal was taken to this court which has jurisdiction under 28 U.S.C. § 1291 et seq.

The charges in the indictment center around three sales of LSD by appellants in February, March and April, 1963. It was stipulated during the trial " * * * that LSD is a new drug within the meaning of the Federal Food and Drug Act, and also that the LSD sold by the defendants, if it had been introduced into commercial channels covered by the Federal Food and Drug Act, was not properly labeled." Appellants never disputed that they made the three sales of LSD. They contended, however, that the LSD sold by them originated in California and never became subject to federal regulation and that the three sales made by them did not constitute the offenses charged in the indictment even if the LSD had been transported into California from a foreign place.

The record is very lengthy and it would serve no useful purpose to attempt to set out in detail all of the testimony that was presented during the ten-day court trial. We will, however, set out in the light most favorable to the government, a short summary of some of the essential testimony presented.

In January, 1963, the defendants in Menlo Park, California, offered to sell LSD to Myron Stolaroff, who was at the time of sale and trial president of the International Foundation for Advanced Study which was conducting clinical observations of the use of LSD. Roseman at that time stated that the LSD was made in Israel and that he worked there with some chemists to help them make it. The appellants offered to sell the LSD for $600 a bottle or $5000 for ten bottles. During this meeting Roseman gave Stolaroff a sample, diluted from their concentrated supply of LSD.

On January 31, 1963, appellants met with Leo Aquino in Vancouver, British Columbia. The appellants showed Aquino a small mason jar partially full of a dark green liquid and told him it was LSD. That evening the appellants came to Aquino's home and gave him a dose of LSD diluted in a glass of water. After drinking the liquid Aquino remained under its influence for several hours. Appellants told Aquino that they wanted to contact a Dr. MacLean to provide him with LSD. An appointment was made and appellants met with Dr. MacLean in Westminster, British Columbia, and told him they had LSD for sale which came from Isarel, and asked whether he wished to purchase it.

A few days later appellants arranged with Aquino to have an "LSD session" involving a number of people, which appellants said would cost the participants $10 each. On February 4, 1963, the session was held in Vancouver, British Columbia, at which time Roseman mixed a solution of what he claimed to be LSD in water glasses, which was consumed by Aquino and others. One participant, after drinking the solution, left the house and was injured. He was brought back to the LSD party, and when a suggestion was made that medical help be obtained Copley quickly stated that "bringing a doctor at this time would result in a report and the report would implicate everybody in question and that the effects of having taken something would be clearly noticeable in all of us, and this

---

1. 18 U.S.C. § 545.

2. 21 U.S.C. §§ 321, 331, 333, 352 and 353.

3. 18 U.S.C. § 371.

4. Sentences on all counts were ordered to run concurrently.

would in turn jeopardize people's livelihood." On February 6, 1963, after appellants had left Vancouver by automobile and had arrived in Seattle, Washington, Roseman phoned from Seattle to Stolaroff in Menlo Park, California, inquiring as to whether he was ready to purchase LSD. Appellants then proceeded by bus to Washington and then by truck through Oregon to California. On February 8, 1963, appellants talked to Stolaroff in Menlo Park, California, and there sold and delivered to him two bottles of LSD for which they received $1200.00.

On March 29, 1963, appellants talked to Pilson, a government agent who was posing as a distributor of pharamaceuticals in San Francisco, concerning the sale of LSD. In a telephone conversation Copley told him that the supply of LSD was no problem and that what they had was the result of the labor of a group of chemists in Israel. Appellants later went to Pilson's house, at which time they stated that they did not manufacture the LSD, but the LSD they had was smuggled into this country in high concentration.

There was a general discussion between Pilson and appellants as to the amount of LSD that he wanted to purchase, during which it was mentioned that he might want to buy from $5,000 to $10,000 worth. Pilson stated that he wanted a small sample to test first. During the conversation appellants indicated they were concerned as to how the LSD was to be distributed. Roseman stated that anyone taking LSD "especially the wrong individual might develop a psychosis and could walk through a window and not even know it." Pilson assured appellants there would be no notoriety connected with his acquisition of the LSD. Roseman left Pilson's house to obtain the sample and returned with it. The amount obtained was "approximately 60 milliliters, supposedly 100 milligrams per milliliter of LSD." The sample of LSD delivered was a liquid in a glass bottle of a dark green color. When it was delivered to Pilson it did not have any label on it nor any warnings as to use, any common name, any statement of the ingredients or composition of the drug, nor any of the other markings required by the Federal Food, Drug and Cosmetic Act; nor did Pilson give them any prescription in order to procure this drug. Pilson paid to the appellants for this sample $100.00. In the course of a discussion as to whether the LSD would decompose, Roseman stated that he possessed this LSD for about three years and that he had walked around Europe with the material for about a year. When the sample had been delivered to Pilson, there was a discussion about the larger purchase. Pilson was to have the sample tested, and if it was satisfactory, he would obtain the $10,000 and they would close the large purchase on April 3rd. Pilson talked on the telephone to both appellants on April 1 and advised them that the money was being flown in to him from Chicago. Pilson asked Roseman what denominations he would like the money to be in when it was delivered, and Roseman stated "$100 bills." Roseman stated that he was going to fly to Los Angeles that evening and pick up the $10,000 worth of LSD. On April 3 Copley telephoned Pilson and told him that the entire Los Angeles stock of LSD was in town and that he believed it was all made up in two separate portions— one of $5000 worth and another of $10,000 worth. About an hour or so after this telephone call the appellants came to Pilson's home. Roseman had an attaché case with him. He opened this case and removed one brown quart plastic bottle and one brown pint plastic bottle, and placed them on the table, saying, "This is the material, the $10,000 worth and here is the extra five." Pilson started to count out the money, during which time another customs agent entered the room wearing a badge and carrying a carbine, stating, "We are federal offi-

cers, hands up." [5]  Copley grabbed the special agent's carbine and began wrestling with him.  Roseman jumped upon the special agent's back and a scuffle ensued.  Another agent entered the room and appellants were subdued.

Roseman testified to the following at his trial.  He testified that the LSD was not made in Israel but was made in Los Angeles in 1960 while he was working with a Dr. Grossman, a friend of his, at the California Corporation for Biological Research.  Although not a chemist, he worked with Dr. Grossman in making the LSD, at least a portion of which was made into pills.

In September, 1960, Dr. Grossman and Roseman, who had been sharing an apartment, terminated their employment at the California corporation and decided to take a trip to Europe.  Roseman took the LSD in plastic bottles out near the Joshua Tree National Monument which is a considerable distance from Los Angeles and is over 3000 feet in elevation. He buried the LSD about four and a half feet below the surface of the ground and "made the place look extremely like it wasn't dug or anything."  He put plastic containers filled with liquid and bottles filled with pills into a large jar.  After he had buried the LSD, he and Dr. Grossman left Los Angeles.  Dr. Grossman did not have any knowledge of his, Roseman's burying the LSD.  The two of them drove across the country to New York City where they took a ship for Rotterdam in November.  They traveled through various parts of Europe and then went to Israel where they stayed about six weeks.  After leaving Israel they went back to Europe.  When they arrived in Zurich they separated, Dr. Grossman going back to Israel and Roseman going to Paris.  Roseman returned to the United States in the fall of 1961. Thereafter, Roseman went into business in Philadelphia, got married, and in the summer of 1962 had a visit from appellant Copley.  Copley and Roseman associated together for some time in the East. In the fall of 1962 Roseman and his wife drove out to California where they again met Copley.  While in Southern California he went out to the Joshua Tree National Monument, dug up the LSD which had been buried there, took one of the plastic bottles of liquid LSD and kept it in his refrigerator.

Roseman did not deny in essence the testimony of the government witnesses that appellants made the sales of the LSD set out in the indictment.  He did, however, contend that none of the LSD involved in these sales was imported or brought into California from a foreign place.  He admitted making various statements that the LSD was imported from Israel, but he contended that this was not in fact true, and that these statements were only made as a "sales pitch." He admitted that he and Copley had LSD in San Francisco prior to leaving for Canada and that they started the trip to Canada with the LSD in their possession.  He testified, however, that on this trip they went through some redwood trees in Northern California about midnight, and they then stopped their truck and he walked "about 100 yards into a cluster of trees" and with a big tablespoon pushed away a little dirt and left a bottle of LSD under the dirt in a plastic container of about "a quarter of a quart." They then proceeded in the truck through Oregon and Washington, and by train into Vancouver, British Columbia, Canada. He contended that Aquino's testimony that appellants had LSD in Canada is not true.  He does not deny, however, that immediately upon appellants' return from Canada they sold some LSD to Stolaroff for $100.00.  Copley did not testify as a witness.

Appellants filed separate briefs in this court, in each of which they make 31 specifications of error.  Among appellants' contentions are claims that the charges in the indictment do not state public offenses, that the evidence is in-

5.  Pilson also testified that all of the conversations between him and appellants were recorded and that other customs agents were in his home during the time of his conversations with appellants.

sufficient to sustain those charges, that there was insufficient evidence to show that the LSD was imported into the United States either from Israel or from Canada, and that there was no sufficient evidence to establish that even if the drug was brought back from Canada, it was not properly labeled. Other contentions include claimed improper procedure during the trial.

Appellants' contentions challenge the convictions on all nine counts. However, since the sentences are all to run concurrently, five years on Counts 1 and 2, and one year on the remaining counts, if we affirm the convictions on either Count 1 or Count 2, it will be unnecessary for us to consider the contentions concerning the other counts. E. g., Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929).

Therefore, since we hold that the convictions on Count 1 are sustained, we shall devote the remainder of this opinion to an analysis of appellants' challenges to that count.

Count 1 of the indictment charges the sale to Pilson on March 29, 1963, for the sum of $100.00 of about two fluid ounces of LSD in violation of 18 U.S.C. § 545.[6] The pertinent part of 18 U.S.C. § 545 reads as follows:

> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—
>
> Shall be fined not more than $10,000 or imprisoned not more than five years, or both.
>
> Proof of defendant's possession of such goods, unless explained to the sat-

isfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

The essential elements of this charge are (1) that the appellants sold the LSD to Pilson, (2) that appellants had knowingly brought this LSD into the United States contrary to law, and (3) that the LSD was not adequately labeled, or that the LSD was a "new drug" within the meaning of 21 U.S.C. § 321(p) for which there was no effective new drug application.

As to item (1), the appellants do not deny that the sale occurred and both Pilson and Roseman testified as to its occurrence.

As to items (2) and (3), appellants specify many errors which we shall now discuss and answer. First, they contend that the evidence is insufficient to support a conclusion that the LSD sold to Pilson was brought into the United States from either Israel or Canada. There is definite evidence that appellants had LSD in California and that they had it with them when they started to Canada. There was also evidence by government witnesses that they had the LSD in Canada, and that they there gave some to Aquino to use, and that they there supplied LSD to others for use in an "LSD session." The evidence also shows that appellants left Canada shortly thereafter, that while in Seattle they phoned Stolaroff as to whether he was ready to make a purchase of LSD, that they then proceeded through Oregon to California, and made a sale to Stolaroff of a small amount of LSD. The evidence also shows that on March 29, 1963, they sold another small portion of LSD to Pilson. It is entirely consistent with the evidence that the portion of LSD sold to Pilson was a part of the same concentrated LSD that appellants had brought to Canada and brought back with them from Canada through Washington and Oregon to California. The able and experienced district judge indicated that he did not believe

---

6. Count 2 similarly charges a violation of 18 U.S.C. § 545 in connection with the sale on April 3, 1963, to Pilson of the larger amount of LSD for which appellants were to receive $15,000.

the story of the midnight burial of the LSD in the redwoods, and in fact the story is so fantastic as to defy belief.

■ We need not consider the evidence concerning importation from Israel since we hold that the evidence amply supports a finding that appellants brought the LSD from Canada into the United States.

■ To satisfy the requirements under items (2) and (3) there must have been a violation of the Federal Food, Drug and Cosmetic Act. Under Count 1 it is necessary to establish that the LSD was brought from Canada to the United States "contrary to law." 21 U.S.C. § 355(a) provides that "no person shall introduce * * * into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug," and subsection 355(b) provides in part that "any person may file with the Secretary an application with respect to any drug * * *." During the trial counsel for appellants stipulated that "LSD is a new drug within the meaning of the Federal Food and Drug Act, and also that the LSD sold by the defendants, if it had been introduced into commercial channels covered by the Federal Food and Drug Act, was not properly labeled." The Food, Drug and Cosmetic Act, 21 U.S.C. § 321(b), defines interstate commerce as follows:

The term "interstate commerce" means (1) commerce between any State or Territory and any place outside thereof * * *.

Thus the bringing of the LSD from Canada into the United States and from the state of Washington to the state of California was a movement in interstate commerce.[7] There was testimony that appellants had not made any application

to the Secretary as provided for in section 355(b). 21 U.S.C. § 352 lists many labeling requirements without the satisfaction of which a drug shall be deemed to be misbranded.[8] The evidence is ample to establish in this case that when the LSD was sold by appellants and when it was brought into the United States, it was not labeled as required by the provisions of the Federal Food, Drug and Cosmetic Act.

■ The introduction of misbranded drugs into interstate commerce is prohibited by 21 U.S.C. § 331(a). The introduction into interstate commerce of a new drug in violation of 21 U.S.C. § 355 is prohibited by section 331(d). Under 21 U.S.C. § 333 any person who violates section 331 is guilty of either a misdemeanor or a felony, depending upon the circumstances. Therefore, we hold that the requirements under items (2) and (3), that the LSD was brought into the United States contrary to law, have been satisfied. No objections of merit to this holding have been presented by appellants.

■ Appellants contend also that the evidence does not support a finding that they acted "knowingly" as required by 18 U.S.C. § 545. There is no merit to this contention since there is ample evidence in the record to support a finding that appellants were aware at all relevant times that the sale of LSD under these circumstances was contrary to law.

Appellants next contend that it was error to charge them with violations of 18 U.S.C. § 545 because they claim violations of the Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C. § 301 et seq. (hereinafter FDCA) can not be used as a basis or partial basis for a prosecution under the general, contrary-to-law provision of 18 U.S.C. § 545 because the exclusive

---

7. 230 Boxes, etc., of Fish v. United States, 168 F.2d 361 (6th Cir. 1948).

8. Among these are requirements under section 352(b) that the drug in package form bear a label containing the name of a manufacturer, packer, or distributor; an accurate statement of the quantity of the contents of the drug; and under section 352(f) that its label bear adequate directions for use, and such adequate warnings against use where its use may be dangerous to health, or against unsafe dosage and the like, for the protection of users.

penalties for such violations are provided by the FDCA.

In effect, appellants are claiming that a prosecution under the contrary-to-law provision of section 545 based on a violation of the FDCA is incompatible with the general purposes of the FDCA. We disagree. Neither this court nor the appellants has discovered anything in the legislative history or in the FDCA itself bearing on the question of what effect the enactment of the FDCA in 1938 had upon prosecutions under section 545. In order to establish their contention, appellants argue that we should apply the following rule of construction: a statute, such as the FDCA, which is a complete body of law carrying its own penalties supersedes a general, previously enacted statute, such as section 545. This is not an appropriate case for this rule.[9] Even though a mechanical application of factors such as the relative dates of enactment and the relative specificity of the statutes, absent other manifestations of legislative intent, might be helpful where there is a clear case of conflict between two laws, it is not helpful in deciding whether two laws are in conflict at all. Our examination of the purposes served by the two statutes in question leads us to conclude that appellants' prosecutions under section 545 do not conflict with the general purposes of the FDCA.[10]

Under the FDCA it is not the transportation in interstate commerce which constitutes the offensive activity, but it is misbranding, adulterating, dispensing without a prescription, and the like, which are the prohibited acts, 21 U.S.C. § 331. The transportation in interstate commerce is essentially a jurisdictional requirement the presence of which is necessary in order for Congress to act pursuant to the commerce clause of the Constitution. The obnoxious nature of the proscribed activities is present to the same extent if the items are transported wholly intrastate. On the other hand, under 18 U.S.C. § 545 the transportation

9. If we were to apply appellants' rule that a later specific statute forecloses prosecution under a prior general statute, we would have to determine the date of enactment of 18 U.S.C. § 545 for this purpose. The history of the statute reveals that its predecessors date back to the previous century at which time it had substantially the same appearance as it has now. The clandestine importation provision was codified in Rev.Stat. § 2865 (1875), and the contrary-to-law provision was codified in Rev.Stat. § 3082 (1875). In the Tariff Act of 1922 the two provisions were united under section 593 of that act, 42 Stat. 982, 19 U.S.C. § 497 (1926). The section was reenacted in the Tariff Act of 1930, section 593, 46 Stat. 751, 19 U.S.C. § 1593 (1940). The next and most recent reenactment was on June 25, 1948, 62 Stat. 716, as amended, 18 U.S.C. § 545 (1964). Each enactment left the substantive provisions of the act substantially intact.

From this history it could be argued that section 545 was enacted in 1948 subsequent to the FDCA, and that it prescribes a specific penalty for importation contrary to law, whereas the FDCA merely has a general penal provision, 52 Stat. 1043 (1938), as amended, 21 U.S.C. § 333 (Supp.1965), which does not specifically deal with importation. See Callahan v. United States, 285 U.S. 515, 52 S.Ct. 454, 76 L.Ed. 914 (1932). Cf. Singer v. United States, 323 U.S. 338, 345 n. 5, 65 S.Ct. 282, 89 L.Ed. 285 (1945); Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789 (1937). Accepting this argument, the application of appellants' theory would seem to require the conclusion that prosecution under section 545 is not only permissible but is the sole basis upon which a conviction could be made.

However, we do not reach this conclusion because for the purposes of this case we shall consider one of the enactment dates prior to 1948 as being the relevant date of enactment. We do this for two reasons: first, we feel that a thorough analysis of legislative purpose is necessary; and secondly, the 1948 reenactment appears to be a recodification with only slight changes in phraseology undertaken by Congress without consideration of its substantive impact.

10. This does not mean that we would sustain the imposition of consecutive sentences where the defendant is convicted under both acts. Such a sentence could pose a problem of double jeopardy. We are not faced with that situation since the sentences imposed here run concurrently.

of the "merchandise" into the United States is the activity which is prohibited. (This is obvious as to the first paragraph of section 545—not involved in this case —which prohibits clandestine importation.) The second paragraph of section 545—which is involved here—can only be interpreted as manifesting a determination by Congress that the importation itself of merchandise "contrary to law" is a serious enough crime to warrant separate and rather severe punishment regardless of what the penalty is for the violation of another law.

■■ On its face this provision contemplates that one who violates it will have also violated another existing law in force at that time. See Bookbinder v. United States, 287 F. 790 (3d Cir. 1923). The overlap between the statutes also occurs from the necessity of including importation within the definition of interstate commerce under the FDCA, 21 U.S.C. § 321(b), (see footnote 7, supra) in order to avoid a loophole in the law. If the FDCA did not cover importation, it would be possible for someone to transport merchandise into the United States or from one border state to another via a foreign country without conforming to the substantive provision of the FDCA and without violating either the FDCA or the contrary-to-law provision of 18 U.S.C. § 545. The fact that the FDCA avoids this loophole by including importation within the scope of its coverage should not be considered as implicitly superseding section 545. The absence of a knowledge requirement in the FDCA and the presence of a knowledge requirement in section 545 is additional support for our conclusion that there is no conflict between the two acts. The FDCA requires neither intent nor knowledge for a violation as a misdemeanor (subjecting the violator to imprisonment for not more than one year and/or a fine of not more than $1,000, 21 U.S.C. § 333), while section 545 requires the offender to act with knowledge before a violation has been committed (subjecting the offender to imprisonment for not more

than five years and/or a fine of not more than $10,000), Wishart v. United States, 29 F.2d 103, 107 (8th Cir. 1928). The fact that more severe penalties are imposed under the FDCA (not more than three years imprisonment and/or a fine of not more than $10,000, 21 U.S.C. § 333(b)) if a violation is done "with intent to defraud or mislead" does not detract from our conclusion because this element of culpability in the FDCA is not related to the manner of transportation, nor is it the same as acting knowingly.

Appellants cite two cases in which prosecutions were foreclosed under a predecessor of section 545 because another statute was held to provide the exclusive penalty. United States v. Mueller, 178 F.2d 593 (5th Cir. 1949) (illegal importation of lottery tickets); Palmero v. United States, 112 F.2d 922 (1st Cir. 1940) (illegal importation of opium). These cases are not controlling here because in both instances the courts found evidence of legislative intent that the activities there involved should be prosecuted under a statute other than the predecessor of 18 U.S.C. § 545.

■■ This appears to be the first time that a court has been asked to uphold a conviction on the contrary-to-law provision of section 545 based on a violation of the FDCA. However, there are other cases in which an argument similar to the one appellants now make was presented and was rejected in favor of sustaining convictions under section 545 or its predecessor. Duke v. United States, 255 F.2d 721 (9th Cir.), cert. denied, 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed. 2d 1365 (1958) (importation contrary to regulations of the Surgeon General); United States v. Kushner, 135 F.2d 668 (2d Cir.), cert. denied, 320 U.S. 212, 63 S.Ct. 1449, 87 L.Ed. 1850 (1943) (importation contrary to regulations under the Gold Reserve Act); Callahan v. United States, 53 F.2d 467 (3d Cir. 1931), aff'd 285 U.S. 515, 52 S.Ct. 454, 76 L.Ed. 914 (1932) (importation contrary to the National Prohibition Act). We therefore conclude that prosecution under the

contrary-to-law provision of section 545 is not foreclosed by the FDCA.

Most of apppellants' remaining contentions concern the conduct of the trial. We have examined all of them and are of the opinion that they are without merit.

■■ Appellants' specifications of error 12 to 16, inclusive, involve rulings of the district judge during the testimony of Dr. Grossman. This witness was called by the government and asked only two questions: whether in December, 1960, and January, 1961, he traveled from the United States to Israel, and whether he was accompanied by the appellant Roseman. Thereafter, appellants examined the witness in detail as to a great many matters in addition to the trip to Israel. As to certain questions, objections were sustained because not within the scope of the direct examination or because the witness refused to answer on the ground that it might tend to incriminate him. The witness was from Richmond, Virginia, and when his counsel who was present in court pointed out that the witness' wife was ill, the court suggested that if the appellants decided to make him their witness they should do it at that time so that he could return to his home in Virginia. Appellants refused to do this. We think the district judge permitted great latitude in the examination of Dr. Grossman and committed no error on his rulings in response to appellants' objections or in his suggestion that the witness' testimony be completed while he was on the stand. The conduct of a trial is always a matter within the discretion of the trial judge and there was no abuse of discretion here.

A statement made by the witness Dr. Grossman to the government some months prior to the trial was demanded by appellants and delivered to the district judge for examination *in camera,* but was not permitted to be examined by appellants' counsel. This statement was sealed as an exhibit and is a part of the record in this case. We have examined the statement and under the circumstances of this case find no error in the ruling of the district judge as to its production.

Specifications 17 to 29, inclusive, refer to minor evidential rulings covering the sustaining or overruling of objections during the examination of various witnesses. We have examined appellants' contentions and in our opinion they refer to minor and harmless matters. We find no error in these rulings. To discuss them in detail would unduly lengthen this already long opinion.

■ Specification 30, concerning whether a waiver of a jury trial was coerced, is equally without merit. The record clearly shows that each appellant and separate counsel for each appellant in open court waived a jury trial after a detailed interrogation by the district judge as to their desires.

■ In specification 31 appellants contend that the denial by the district judge of their motion for a new trial constituted an abuse of discretion. During the hearing of this motion both sides presented affidavits. The district judge pointed out that these affidavits were conflicting and denied the motion for a new trial. We see no abuse of discretion in such denial. Beyda v. United States, 324 F.2d 526 (9th Cir. 1963).

After having considered all of appellants' contentions of error and carefully examined the record, we hold that appellants' convictions on Count 1 must be sustained. The judgments as to each appellant must therefore be affirmed.