United States Court of Appeals,

Fifth Circuit.

No. 94-30389.

UNITED STATES of America, Plaintiff-Appellant,

v.

FOOD, 2,998 CASES, etc., Defendant.

First Phoenix Group, Ltd., Claimant-Appellee.

Sept. 26, 1995.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before WOOD, Jr.,[*] JOLLY and DeMOSS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal presents complex, difficult, and close questions. It is, however, a case that is unlikely to arouse widespread passion.

The case begins with an import alert for mushrooms canned in China and falsely bearing the labels of certain Taiwanese manufacturers. Based on the alert, the Food and Drug Administration (the "FDA") detained two shipments of mushrooms owned by appellee First Phoenix Group Limited, Inc. ("First Phoenix"). The question that drives this appeal is what is to be done with these mushrooms now that they have been detained by the Customs Service at the port of entry; First Phoenix argues that it

---

[*]Circuit Judge of the Seventh Circuit, sitting by designation.

1

is entitled to "reexport"[1] them, and the FDA argues that it has the authority to destroy them. The FDA filed a complaint in the United States District Court for the Eastern District of Louisiana, asserting authority to destroy the mushrooms under 21 U.S.C. § 334 of the Federal Food, Drug, and Cosmetic Act (the "FDCA"). First Phoenix argued that when imported goods are detained at the port of entry, the FDA could invoke only the administrative procedures under 21 U.S.C. § 381 of the FDCA to refuse entry of the goods into the United States and then allow First Phoenix ninety days to "reexport" the mushrooms before the FDA could destroy them. The district court agreed and dismissed the FDA's complaint. The resolution of whether the district court erred in dismissing the complaint depends upon whether the mushrooms were ever "introduced into interstate commerce" within the expansive definition contained in the FDCA; and, second, upon whether, in the statutory scheme, Congress intended that § 334 judicial proceedings could be invoked only after the goods had been released from the Customs Service.

We conclude, given the broad statutory definition of interstate commerce, that the mushrooms were in interstate commerce and that neither the plain words of the statute nor congressional intent behind the statute bars FDA's proceeding under § 334 in this case.

I

_____

[1]This inside term is somewhat misleading. When imported goods have been refused admission into the United States, "reexport" is a convenient term describing the opportunity given to the importer to send these goods out of the United States.

In October 1989, the Food and Drug Administration (the "FDA") issued an "import alert"[2] for all canned mushrooms processed in China in response to a food-borne illness caused by staphylococcal enterotoxin found in canned mushrooms produced in nine China factories. Appellee First Phoenix Group Limited, Inc. ("First Phoenix"), an importer of food products, purchased several orders of canned mushrooms supposedly packaged at Hwa Chen Industrial Corporation ("Hwa Chen") in Taiwan. In late spring 1992, First Phoenix attempted to enter two shipments of mushrooms—3,000 cases and 6,000 cases—into the United States. The 3,000-case shipment was unloaded at Savannah, Georgia, transported under a United States Customs Service transit bond to a bonded warehouse in Tampa, Florida, and offered for entry on May 26, 1992. The United States Customs Service (the "Customs Service") conditionally released these mushrooms under bond pending review by the FDA. The mushrooms then were shipped to a bonded warehouse in New Orleans, Louisiana, the destination city for each shipment, and have remained in this warehouse since this time. The 6,000-case shipment was unloaded at Long Beach, California, in early July 1992, transported under a Customs Service transit bond to a bonded warehouse in New Orleans, and offered for entry on behalf of First Phoenix by Transoceanic Shipping.

On July 10, 1992, the FDA issued a second import alert

---

[2]An import alert advises FDA field offices of ongoing problems with a specific product offered for import and suggests appropriate action, such as detention for inspection and sampling.

advising its field offices to detain shipments of canned mushrooms from specified Taiwanese manufactures, including Hwa Chen. The FDA issued this import alert because mushrooms labelled as packaged and produced from these specified manufacturers actually were processed and packaged in an unknown factory in China. Because of this import alert, the FDA issued Notices of Detention and Hearing for the 3,000-case shipment on July 29, and for the 6,000-case shipment on December 14.[3] In these notices, the FDA indicated that it was acting under its power in § 381(a) of the Federal Food, Drug, and Cosmetic Act (the "FDCA"), 21 U.S.C. §§ 301 *et seq.* Based on an examination of cans from both shipments[4] and additional information provided by Hwa Chen, the FDA determined that the mushrooms were not processed or packaged in Taiwan. The FDA thus concluded that an unknown factory in China used Hwa Chen's can codes in a deliberate attempt to circumvent the broad import alert on canned mushrooms originating in China. The FDA then advised First Phoenix that it would likely refuse admission of the mushrooms and allow reexport only under very strict conditions. The FDA, however, issued no formal notice of refusal of admission. The FDA then conducted additional testing of a separate lot of mushrooms ostensibly packaged at Hwa Chen and shipped into the United States by First Phoenix, but not at issue in this appeal. Based on staphyloccal enterotoxin found in these mushrooms, the FDA informed

---

[3]Between July 29 and December 14, First Phoenix located a purchaser in Russia for the mushrooms.

[4]The FDA sampled the mushrooms from the 3,000-can shipment, but found no adulteration of the mushrooms.

First Phoenix of its decision to destroy the mushrooms, rather than allow reexport. Thus, the FDA decided to proceed under the authority provided in 21 U.S.C. § 334, instead of proceeding under 21 U.S.C. § 381.

Accordingly, on November 3, 1993, the government filed a complaint in the United States District Court for the Eastern District of Louisiana seeking seizure and condemnation of both shipments of mushrooms as adulterated and misbranded goods in interstate commerce under its authority in 21 U.S.C. § 334(a) of the FDCA. Under the district court's warrant for the arrest of both shipments, the United States Marshals Service seized and attached the shipments at the New Orleans warehouse where they were stored upon entry into New Orleans and continue to be held at the present time. On April 19, 1994, the district court granted summary judgment in favor of First Phoenix and dismissed the government's case. The district court held that the mushrooms had never entered interstate commerce as required for an action under § 334(a) because they had continually remained under Customs Service transit bonds. The district court thus determined that the Customs Service remained in control of the mushrooms since their import into the United States. Finally, the court concluded that § 381(a) was the government's exclusive authority with respect to the mushrooms and gave First Phoenix the opportunity to reexport the two shipments before being destroyed by the FDA. Thereafter, the district court denied the government's motion for reconsideration and granted its motion for a stay of the judgment

5

pending appeal.

On appeal, the government argues that because the mushroom shipments fall within the statutory definition of "interstate commerce," it had the authority to bring a § 334 seizure and condemnation action in the district court. The government further contends that its authority to act under this statute is unaffected by the fact that the administrative remedy in § 381 is also available to it in this case. The government thus concludes that the district court erred in granting summary judgment in favor of First Phoenix on the basis that § 381 restricted the government's authority under § 334 to situations when the goods at issue were in "interstate commerce."

II

In this appeal, we must consider whether the district court erred in granting summary judgment in favor of First Phoenix and dismissing the government's complaint on the grounds that the facts here failed to demonstrate a claim under § 334.[5] To resolve this

---

[5]Because this is a case on appeal from the district court's grant of summary judgment, we review the record *de novo*. *Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1412 (5th Cir.1993).

The government argues that the FDA's interpretation of the statutes at issue in this case should be given "controlling weight." *See Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (holding permissible interpretation of agency charged with administering statute at issue must be given controlling weight when Congress had not addressed question at issue). Because it appears that the FDA interpreted § 334 and § 381 at such a time and in such a manner so as to provide a convenient litigating position for this suit, we disagree and conclude that the FDA's position is not controlling. *See Irving Indep. Sch.*

6

question, first, we must determine whether imported goods, which never are released from Customs Service upon arrival in the United States satisfy the interstate commerce requirement, as defined in the FDCA. Second, we must determine whether a § 334 judicial proceeding may be brought with respect to goods seized at the port of entry and never released by the Customs Service or whether in these circumstances, the FDA is limited to the administrative procedures under § 381. We hold that the interstate commerce requirement has been satisfied in this case and that goods seized at the port of entry may be the proper subject of an action under § 334. We therefore reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

III

A

We first examine whether the mushrooms in this case were introduced into "interstate commerce," as required to initiate a seizure and condemnation action under § 334. In relevant part, 21 U.S.C § 334(a)(1) provides:

> Any article of food, drug, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale ... after shipment in interstate commerce ... shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on liable of information and condemned in any district court of the United States ... within the jurisdiction in which the article is found.

21 U.S.C. § 334(a)(1) (1972 & Supp.1995). Thus, to initiate an

---

*Dist. v. Packard Properties,* 970 F.2d 58, 64 (5th Cir.1992) (discounting strategically timed and conveniently favorable agency interpretation given after agency's involvement in litigation over the disputed provision).

action for seizure and condemnation, the FDA must prove only that the goods have been introduced into interstate commerce, notwithstanding the fact that the goods may be removed at some later time from interstate commerce. The FDCA expansively defines interstate commerce as "commerce between any State or Territory and any place outside thereof."[6] 21 U.S.C. § 321(b) (1972). Here, each shipment was shipped from a place outside the United States—Taiwan—and entered the United States at Savannah, Georgia, and Long Beach, California, respectively, where they arrived and were unloaded.[7] There is some suggestion, however, that these mushrooms may have been effectively detained at sea by the import alert and thus were removed from the stream of commerce before they actually entered the United States. If, however, goods are destined for sale in a state other than the place from which they are shipped, then goods are in "interstate commerce" without the necessity of physically crossing a state boundary. *Merchants Fast*

---

[6]We have found very few cases interpreting this provision and none within our circuit. In *Roseman v. United States,* 364 F.2d 18 (9th Cir.1966), *cert. denied,* 386 U.S. 918, 87 S.Ct. 879, 17 L.Ed.2d 789 (1967), the Ninth Circuit broadly interpreted interstate commerce under § 321(b) to include transportation from Canada into the United States and from Washington to California. *Roseman,* 364 F.2d at 24 (citing *230 Boxes, More or Less, of Fish v. United States,* 168 F.2d 361 (6th Cir.1948)). The court noted that § 321(b) included "importation" within its definition as a means to avoid the possibility that someone could transport "merchandise into the United States or from one border state to another via a foreign country without conforming to the substantive provision of the FDCA and without violating" the FDCA. *Roseman,* 364 F.2d at 26.

[7]When these goods left Taiwan, they were destined for New Orleans and were unloaded in Georgia and California because overland transportation was more convenient and inexpensive than direct shipment to New Orleans, Louisiana.

*Motor Lines, Inc. v. Interstate Commerce Comm'n,* 528 F.2d 1042, 1044 (5th Cir.1976); *see Texas v. United States,* 866 F.2d 1546, 1556 (5th Cir.1989) (stating intent at time of shipment is crucial to determination of essential character of shipment as interstate or intrastate). Thus, we conclude that the mushrooms in this case undoubtedly constituted an interstate shipment from the moment they left Taiwan.

The question remaining is whether these goods, which were never released for sale in the United States from the Customs Service, were also in "commerce," as required by § 321(b). First Phoenix argues that these mushrooms could not possibly be in commerce because from the moment the goods were placed on alert, even before they arrived in the United States, and at all times thereafter, sale of these goods in the United States was prohibited by the FDA. First Phoenix additionally argues that because the mushrooms were held under Customs Service bonds[8] since arriving in the United States, they were never introduced into interstate commerce as required in § 334 for a condemnation action. First

_____

[8]A Customs Service bond includes any bond required under Customs laws or regulations in order to perform a particular Customs activity. 19 C.F.R. § 113.61 (1994). Under 19 U.S.C. § 1553, "[a]ny merchandise, other than ... merchandise the importation of which is prohibited, ... may be entered for transportation in bond through the United States by a bonded carrier without appraisement or the payment of duties." 19 U.S.C. § 1553 (1980 & Supp.1995). Here, both shipments were transported under bond and to New Orleans based on § 1553. These bonds were obtained to secure duties, taxes, and other charges due on the shipments of the imported mushrooms. *See* 19 C.F.R. § 113.62 illust. a (requiring bond securing duties, taxes, and charges imposed or estimated to be due if merchandise is released from Customs custody).

Phoenix attempts to place an impossibly narrow construction on a very broad statute. Regardless of the government's impediments to the sale of these goods once they reached the United States, these goods nevertheless had been shipped to the United States for the express purpose of sale when they left Taiwan. Although restricted from immediate sale by the import alert and other FDA action, and although they may now have been removed from commerce by the import alerts, the goods were "introduced" into interstate commerce—for the purpose of satisfying the statutory requirements here—when they left Taiwan because they had been then injected into the mercantile stream and were on their way to a market in the United States where potential purchasers awaited. In sum, we hold that these mushrooms had been introduced into interstate commerce at the time they were detained by the Customs Service, given the expansive and unrestricted definition of § 321(b).

Having determined that the mushrooms had been introduced into interstate commerce, it is plain on the face of the statute that § 334 is a judicial remedy available to the FDA in this case. We now must address, however, First Phoenix's argument that Congress intended § 334 to apply only to seizures of goods that have been released from the Customs Service. In short, First Phoenix argues that only the administrative procedures under § 381 may be invoked by the FDA when the goods are seized at the port of entry and not yet admitted into the United States. We now turn to consider this question of whether § 334 and § 381 create two mutually exclusive statutory remedies for goods under the FDCA.

As earlier discussed, § 334(a) is a judicial remedy available to the FDA allowing it to seize and condemn any goods that have been introduced into or are already in interstate commerce or after shipment is in interstate commerce, but if the FDA chooses to proceed under this statute it must prove in a court of law by a preponderance of the evidence that the goods are indeed adulterated or misbranded. Section 381, on the other hand, is purely an administrative procedure, which allows a quick and efficient means of protecting the American public from unhealthy or mislabeled imported goods. In relevant part, 21 U.S.C. § 381(a) provides:

> The Secretary of the Treasury shall deliver to the Secretary of Health ... samples of food, drugs, and cosmetics which are being imported or offered for import into the United States ... [and] if it appears from the examination of such samples ... that ... such article is adulterated, [or] misbranded such article *shall* be refused admission, except as provided in subsection (b) of this section. The Secretary of the Treasury shall cause the destruction of any article refused admission unless such article is exported, under regulations prescribed by the Secretary of the Treasury, within ninety days of the date of notice of such refusal or within such additional time as may be permitted pursuant to such regulations.

21 U.S.C. § 381(a) (1972 & Supp.1995) (emphasis added).[9]

Clearly no provision of § 381 expressly restricts the authority of the FDA from proceeding judicially under § 334 when it seizes and holds goods at the port of entry in the United States.[10]

___

[9]The FDA has not issued a formal notice of refusal of admission of these mushrooms.

[10]We point out that § 381 undoubtedly only applies to goods detained at the port of entry and any seizure of imported goods after release by the Customs Service *must* submit to judicial

If goods are, in point of time, both "in interstate commerce" and "being imported or offered for import into the United States," as the mushrooms here, the plain words of the statutes permit the government the option of proceeding under either § 334 or § 381.[11] We now examine First Phoenix's arguments, based primarily on legislative history and statutory construction, that these statutes do create mutually exclusive systems for dealing with imported adulterated or misbranded goods, i.e., § 381 applies exclusively to goods at the port of entry and § 334 applies exclusively to goods that have been released from the Customs Service.

(2)

proceedings under § 334.  The question here is whether these statutes provide overlapping remedies for goods seized at the port of entry so that the government, at that point, may chose to proceed under either § 334 or § 381.

[11]First Phoenix argues that the express language of § 381 mandates that adulterated goods being imported or offered for import, as here, *shall* be refused admission.  Once admission is refused, First Phoenix argues, § 381 grants the importer an unqualified right to reexport the goods within ninety days of this refusal.  First Phoenix contends, and the district court agreed, that allowing the FDA the option of proceeding under § 334 or § 381 when the imported goods meet the prerequisites of both would emasculate its unqualified right granted by § 381 to reexport goods within ninety days of refusal of admission.

We acknowledge that this plain language projects a forceful argument that importers have an unequivocal right to a notice of refusal of admission.  And it is true that if the FDA proceeds under § 334, as they have in this case, the importer does not receive a notice of refusal of admission and the concomitant right to reexport.  Nevertheless, we are convinced that the more compelling view of the statutory scheme, for reasons we express in this opinion, is that the FDA has an option to proceed under either statute with respect to goods detained at the port of entry, and if the government chooses to proceed under § 334, the right to a notice of refusal and opportunity to reexport provided in § 381 simply is inoperative.

12

When Congress enacted the FDCA in 1938, it intended to strengthen the provisions of its predecessor act—the Federal Food and Drugs Act of 1906 (the "1906 Act").[12]  H.R.REP. No. 2139, 75th Cong., 3d Sess. (1938), *reprinted in* FEDERAL FOOD, DRUG, AND COSMETIC ACT: A STATEMENT OF ITS LEGISLATIVE RECORD 816 (Charles Wesley Dunn ed., 1987) (hereinafter LEGISLATIVE RECORD).  Without substantial change, Congress modeled § 334 and § 381 of the FDCA[13] after § 10[14] and §

_____

[12]The Supreme Court noted:

> By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience.  The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.

*United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943) (internal citations omitted).

[13]With the exception of the two amendments discussed later in this opinion, the 1938 versions of § 334 and § 381 are substantially similar to those presently in effect and quoted in relevant part earlier in this opinion.

[14]The seizure and condemnation provision contained in § 10 of the 1906 Act provided in relevant part:

> *any article of food ... that is adulterated or misbranded* within the meaning of this act, *and* is being transported from one State, Territory, District, or insular possession to another for sale, or, having been transported, remains unloaded, unsold, or in original unbroken packages, or if it be sold or offered for sale in the District of Columbia or the Territories, or insular possessions of the United States, or *if it be imported from a foreign country for sale,* or if it is intended for export to a foreign country, *shall be liable to be proceeded against, ... and seized for confiscation by a process of libel for condemnation.*

13

11,[15] respectively, of the 1906 Act. *See* H.R.REP. NO. 2130, *reprinted in* LEGISLATIVE HISTORY at 818, 827 (stating that FDCA retained without substantial change seizure and condemnation provision of § 10 and import-export provision of § 11 of 1906 Act). Specifically, the FDA's power to refuse admission under § 381 to goods appearing adulterated and "being imported or offered for import into the United States" remained virtually identical to § 11. With regard to the seizure and condemnation provision, Congress compacted the extensive language of § 10, describing the legal character of goods subject to condemnation, simply to those

---

Food and Drugs Act of 1906, § 10, *reprinted in* LEGISLATIVE RECORD at 832 (emphasis added). This entire enumeration of instances when goods could be seized and condemned was replaced in § 334 with "when introduced into or while in interstate commerce or while held for sale ... after shipment in interstate commerce." The underscoring above, however, demonstrates that § 10, according to its express terms, would have been clearly applicable to the mushrooms in this case.

[15]The import-export provision contained in § 11 of the 1906 Act provided in relevant part:

> The Secretary of the Treasury shall deliver to the Secretary of Agriculture ... samples of foods and drugs which are being imported into the United States or offered for import ... and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this act ... the said article shall be refused admission, and the Secretary of the Treasury shall ... cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal.

Food and Drugs Act of 1906, § 11, *reprinted in* LEGISLATIVE RECORD at 832-33. This provision remained substantially unchanged when enacted as § 381, with the exception that the three months given for reexport was technically changed to ninety days in § 381.

14

goods "introduced into or while in interstate commerce or while held for sale ... after shipment in interstate commerce."[16]

First Phoenix primarily relies on the two substantial post-1938 amendments to § 334 and § 381 as support for its position that Congress intended § 334 and § 381 to operate mutually exclusively. Prior to 1949, § 381—unlike § 334—did not allow importers the right to bring adulterated or misbranded goods into compliance with FDA standards. In 1949, however, Congress amended § 381 to give importers this opportunity to cure—an opportunity already recognized, as put by the congressional reports, "with respect to articles *seized in domestic commerce* and condemned by court decree" under § 334. S.REP. NO. 890, 81st Cong., 1st Sess. (1949), *reprinted in* 1949 U.S.C.C.A.N. 2147, 2147 (emphasis added). This underscored language suggests that Congress understood that § 334 applied to goods in domestic commerce, with the implication that § 381 was the applicable statute for proceeding against goods at the port of entry. Moreover, First Phoenix argues with some force that if imported goods detained at the port of entry have already been

_____

[16]First Phoenix recognizes that Congress intended no substantial change from the 1906 Act with respect to the administrative and judicial proceedings of the FDCA. First Phoenix contends, however, that the provisions were always intended to be mutually exclusive remedies for the FDA when dealing with adulterated or misbranded goods. First Phoenix argues that § 11 of the 1906 Act provided the government's exclusive authority with respect to goods detained at the port of entry and allowed the government only to refuse entry of these goods into the United States. First Phoenix contends that this limited power of exclusion for goods detained at the port of entry continued in § 381 of the FDCA. First Phoenix thus concludes that the FDA has never had the power to proceed judicially to destroy the goods that are never released from the Customs Service.

15

"introduced into interstate commerce" within the meaning of § 334, then Congress would have had no reason to amend § 381 to give the FDA the option of allowing the importer to bring his goods into compliance because this option was already available in § 334 for goods in interstate commerce. Therefore, First Phoenix contends that Congress, recognizing that goods detained by the Customs Service at the port of entry are not subject to § 334, amended § 381 to provide importers the opportunity to cure goods not yet admitted into the United States.

Next, in 1957, Congress amended § 334 to provide importers an opportunity, as similarly provided in § 381, to reexport goods in certain instances when, in the words of the congressional report, the imported goods "have been seized by the Food and Drug Administration and condemned at places within the United States other than at the original port of entry." S.REP. NO. 993, 85th Cong., 1st Sess. (1957), *reprinted in* U.S.C.C.A.N. 1791, 1791 (1957). The report explained that "[a]t the present time the Federal Food, Drug, and Cosmetic Act permits the reexportation of articles if they were seized at the original port of entry ... [but] does not permit reexportation of imported articles ... after such articles have entered domestic commerce." S.REP. NO. 993, 85th Cong., 1st Sess. (1957), *reprinted in* U.S.C.C.A.N. 1791, 1791 (1957). Indeed, the Secretary of Health, Education, and Welfare seemed to take note that § 334 applied when adulterated goods were seized in domestic situations: his report provided that the amended § 334 would allow food "imported from foreign countries and

16

entered through customs into the United States, if subsequently seized under domestic provisions of the law as violative of the Food, Drug, and Cosmetic Act may under certain conditions be reexported." S.REP. NO. 993 (quoting Report by M.B. Folsom, Secretary of the Department of Health, Education, and Welfare (August 13, 1957)). Those conditions, now part of the statute as a result of the 1957 amendment, are, first, the FDCA violation must not have occurred after the article was imported and, second, the importer must have had "no cause for believing that it was adulterated, misbranded, or in violation *before it was released from customs custody*." 21 U.S.C. § 334(d) (emphasis added). First Phoenix contends that because the right to reexport under § 334 is expressly limited to goods that have left the port of entry, no right to reexport goods condemned under § 334 exists with respect to goods detained at the port of entry. The right to reexport goods detained at the port of entry does exist, however, under § 381. This distinction between the two statutes clearly indicates, according to First Phoenix, that the rights of importers whose goods are detained at the port of entry are embodied only in § 381 and the rights of importers whose goods are detained after they are released from the port of entry are found in § 334. Thus, First Phoenix cites this 1957 amendment to § 334 as evidence that Congress intended separate, independent and mutually exclusive procedural mechanisms for goods detained at the port of entry, on the one hand, and goods admitted into the United States, on the other hand.

17

In short, First Phoenix concedes that Congress intended to strengthen the United States' food and drug laws when it enacted the FDCA, but argues that nothing in the legislative history or statutory scheme indicates that Congress intended to extend the FDA's power under § 334 to goods offered for import. Instead, First Phoenix argues that Congress understood these two statutes applied at two distinct points in time—before release from the Customs Service and after release—and amended these statutes in order to provide parallel rights under § 381 and § 334. First Phoenix accordingly contends that the legislative history and the statutory scheme supports its view that Congress intended the remedies provided under § 334 and § 381 to operate in mutually exclusive circumstances—an administrative proceeding under § 381 to refuse adulterated or misbranded goods detained at the port of entry and a judicial proceeding under § 334 to seize and condemn goods after admitted into the United States.

(3)

We can appreciate the arguments of First Phoenix as pointing to how the statues logically and practically operate. It certainly appears true that Congress assumed that § 381 and § 334 ordinarily apply in separate factual circumstances. Furthermore, we recognize the more recent amendments of 1949 and 1957 were intended to provide certain parallel rights in each situation.

The legislative history, however, also makes clear that Congress intended to empower the FDA with the broadest possible authority over imported contaminated goods. The plain words of the

18

statute expansively define "interstate commerce" to effectively include foreign commerce. Moreover, no statutory language prohibits the application of § 334 to goods seized at the port of entry. Although the legislative history demonstrates that Congress was under the impression that § 334 and § 381 ordinarily operate exclusive of each other, we cannot say, in the face of Congress's broad definition of interstate commerce, that Congress intended to preclude the FDA from ever pursuing the judicial remedy provided in § 334 in cases deemed appropriate by the FDA. There will, from time to time, be plausible and practical bases for allowing the government the option of proceeding under § 334 or § 381 when goods are detained at the port of entry. As we have observed, the procedures and burdens established by these two statutes are quite different. When the government lacks the ability to prove a violation of the FDCA by a preponderance of the evidence, or when the risks to human health are not major or critical, the government can pursue the administrative procedures of § 381 and simply require reexportation of the goods. Consequently, the risk of property loss to the owner of the goods is minimized, threats to health and other interests of consumers are avoided, and no significant legal process is required. On the other hand, when the circumstances pose a critical risk to the health of United States citizens, the FDA has the option of initiating a judicial condemnation proceeding under § 334. In this situation, the FDA can destroy the goods without giving the importer the opportunity to reexport, but only after proving by a preponderance of the

19

evidence that the goods are adulterated or misbranded. Accordingly, this more cumbersome remedy has the effect of protecting the property rights of the owner of the goods who do not have the opportunity to reexport. At the same time, § 334 allows the government a sure mechanism, i.e., destruction, to prevent the possibility of undetected reimportation of dangerous goods into the United States. We find this optional system rational and find no sufficient reason to disregard the plain language of § 334, which would be necessary if we accepted the arguments of First Phoenix. In sum, we find no indication that Congress intended to tie the hands of the FDA to deny it flexibility.

We therefore hold that the plain language of § 334 permits the FDA to initiate a seizure and condemnation action, such as the one before us, when goods are seized at the port of entry. The district court is REVERSED and the case REMANDED for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED.