IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-11353
_____


WASTE CONTROL SPECIALISTS, LLC,

                              Plaintiff-Appellee,

                    versus

UNITED STATES DEPARTMENT OF ENERGY; JAMES M. OWENDOFF,
Acting Assistant Secretary for Enviornmental Management;
MARY ANN SULLIVAN, Deputy General Counsel for Environment
and Civilian Nuclear Defense Programs,

                              Defendants-Appellants.
_____

        Appeal from the United States District Court for
              the Northern District of Texas
_____


                 _____

                      No. 98-10331
                 _____


In Re:   UNITED STATES DEPARTMENT OF ENERGY; JAMES M.
OWENDOFF, Acting Assistant Secretary for Environmental
Management; MARY ANNE SULLIVAN, Deputy General Counsel for
Environment and Civilian and Defense Nuclear Programs,

                              Petitioners.


_____

    On Petition for Writ of Mandamus to the United States
        District for the Northern District of Texas
_____
                      May 14, 1998

Before REAVLEY, DeMOSS and PARKER, Circuit Judges.

REAVLEY, Circuit Judge:

Waste Control Specialists, L.L.C. (WCS) sued the Department of Energy (DOE) for rejecting its proposal for a new facility for disposing of DOE's low-level radioactive waste.  After a one day hearing, the district judge granted a preliminary injunction, enjoining DOE from refusing WCS's bid on specific grounds.  We reverse and order dismissal of the case.

## I.  Background

The Atomic Energy Act of 1954 (AEA)[1] empowers the federal government to regulate all activities involving radiological health and safety of atomic energy and its byproducts.  The Low-Level Radioactive Waste Policy Amendments Act of 1985 (LLWPAA) amended the AEA to provide that the federal government is "responsible for the disposal of . . . low-level radioactive waste owned or generated by the Department of Energy."[2]  Low-level radioactive waste (LLRW) is defined in the LLWPAA by what it is not: it is "not high-level radioactive waste, spent nuclear fuel, or byproduct material (as defined in section 2014(e)(2) of this title)."[3]  LLRW generally consists of "section 2014(e)(1) byproduct material": "any radioactive material (except special

---

[1] 42 U.S.C. §§ 2011-2297g-4 (1994).

[2] 42 U.S.C. § 2021c(b)(1)(A).

[3] 42 U.S.C. § 2021b(9)(A).

2

nuclear material [i.e. plutonium or specified uranium isotopes]) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material."[4]

DOE disposes of its LLRW under its "Radioactive Waste Management Policy." In accordance with that policy, the agency's LLRW "shall be disposed of on the site at which it is generated, if practical, or if on-site disposal capability is not available, at another DOE disposal facility."[5] Disposal at a non-DOE facility requires an exemption from this policy. Under the agency's current exemption policy, DOE may use a non-DOE disposal facility if, among other things, the facility "compl[ies] with applicable Federal, State, and Local requirements, and ha[s] the necessary permits, licenses, and approvals for the specific wastes involved."[6]

The AEA authorizes the Nuclear Regulatory Commission (NRC) to issue licenses for LLRW disposal sites and to exempt certain activities from licensing.[7] An NRC regulation provides that "any prime contractor of the Department [of Energy] is exempt from the

---

[4]42 U.S.C. § 2014(e)(1). LLRW may also contain small amounts of "special nuclear material" (see 42 U.S.C. § 2014(aa)) and "source material" (see 42 U.S.C. § 2014(z)).

[5]DOE Order 5820.2A, *Radioactive Waste Management* (Sept. 26, 1988).

[6]DOE Memorandum (Oct. 24, 1996) at 2.

[7]42 U.S.C. § 2111.

requirements for a license set forth in [42 U.S.C. § 2111] . . . to the extent that such contractor . . . transfers, receives, acquires, owns, possess, or uses byproduct material for: (a) [t]he performance of work for [DOE] at a United States Government-owned or controlled site."[8]

The NRC may relinquish to states, by agreement, its authority to license and regulate certain activities, including LLRW disposal facilities.[9]  Among other things, the "agreement state" must certify to the NRC that it "has a program for the control of radiation hazards adequate to protect the public health and safety," and that its public health, safety and environment standards "are equivalent, to the extent practicable, or more stringent that," the NRC's corresponding standards.[10]

Texas is an agreement state.[11]  Under Texas law, "[a] radioactive waste disposal license may be issued only to a public entity specifically authorized by law for radioactive waste disposal."[12]  Thus, a private commercial waste disposal facility

---

[8]10 C.F.R. § 30.12(a) (1997).

[9]42 U.S.C. § 2021(b).

[10]42 U.S.C. §§ 2021(d)(1), 2021(o)(2).

[11]Notice of Discontinuance of Certain Regulatory Authority and Responsibility within the State of Texas, 47 Fed. Reg. 15,186 (Apr. 8, 1982).

[12]TEX. HEALTH & SAEFTY CODE ANN. § 401.203(West 1992).

company is barred by state law from obtaining a license in Texas for the disposal of LLRW.

On August 29, 1996, DOE issued a Request for Proposals (RFP) in connection with the cleanup of its Fernald nuclear site in Ohio.  In the Fernald RFP, DOE required that the bidders demonstrate that they possess, or have the ability to obtain within 27 months of a contract award, "the proper Federal, State and Local permits and licenses for the permanent disposal" of LLRW.

WCS's facility in West Texas is licensed to dispose of hazardous and toxic wastes, but not LLRW.  On September 20, 1996, WCS submitted a proposed bid to the DOE for the Fernald RFP.  WCS included a provision in the application for oversight of the site by the Texas Natural Resource Conservation Commission (TNRCC). In December, after the TNRCC withdrew from consideration as the proposed oversight body, WCS submitted an alternative regulatory oversight mechanism.  Under either plan, WCS argues that it would be exempt from Texas state licensing requirements because it would effectively become a DOE-controlled facility.

On May 5, 1997, DOE sent WCS a letter informing it that, while "DOE is not prepared to accept the WCS proposal as submitted," the agency "is considering" the development of an RFP for future waste disposal contracts that "could . . . allow for alternative regulatory structures."  WCS sued DOE, arguing that

5

DOE's refusal to consider its proposal was arbitrary and capricious.

After a one day hearing, the district court issued an injunction enjoining DOE from denying any WCS bid "on the ground(s) that: (i) WCS is not or cannot be licensed by Texas for the disposal of low-level radioactive or mixed wastes; (ii) WCS is not licensed by the NRC for the disposal of low-level radioactive or mixed wastes; or (iii) WCS has imposed or sought to alter the provisions of the Fernald RFP relative to title to the wastes subject thereto."[13]

## II. Discussion

Both sides agree that WCS' proposal for DOE regulation of the site could lawfully be implemented. They disagree on whether DOE has the discretion to require a state license as a requirement for bidding. DOE's policy requiring such a license is set forth only in its memorandum, which is not the product of a formal rulemaking. Moreover, even that memorandum does not address the issue of utilizing self-regulation of the site in

---

[13]The Fernald RFP included a provision that the bidder must take title to all the wastes. WCS' proposal contained a provision that DOE would be requested to take back title after site closure. The district court found that this future possibility did not "seek or purport to alter or vary the terms relative to title of the RFP." Because we hold that DOE has discretion to require a state license, which WCS cannot obtain, we do not reach the issue of title.

place of a state license.[14]  We will not give deference to DOE's interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it had not enunciated its interpretation prior to the litigation.[15]

In granting the injunction, the district court focused on section 110a of the AEA, which provides that

> "Nothing in this subchapter shall be deemed . . . to require a license for (1) the processing, fabricating, or refining of special nuclear material, or the separation of special nuclear material, or the separation of special nuclear material from other substances, under contract with and for the account of the Commission; or (2) the construction or operation of facilities under contract with and for the account of the Commission."[16]

The district court interpreted this section to mean that the NRC, and thus the agreement states, could not require that a private entity contracting with DOE for LLRW disposal have a license, and that DOE could therefore not require an NRC or state license as a

---

[14]Since this litigation began, DOE has issued a "Notice of Intent to Conduct Policy Analysis; Request for Public Comment," outlining the WCS proposal and a proposal from another private entity and requesting comments on the issue.  63 Fed. Reg. 13,396 (Mar. 19, 1998).

[15]*See United States v. Food, 2,998 Cases*, 64 F.3d 984, 987 n.5 (5th Cir. 1995); *Irving Indep. Sch. Dist. v. Packard Properties*, 970 F.2d 58, 64 (5th Cir. 1992).

[16]42 U.S.C. § 2140(a).  "Commission" refers to the Atomic Energy Commission.  42 U.S.C. § 2014(f).  The district court found that Commission also applied to the DOE, and DOE does not disagree with that.

7

precondition for bidding.  The district court, in issuing the preliminary injunction, stated that "[t]he existence of a state or NRC license is neither a necessary prerequisite nor a sufficient basis for the receipt by a DOE contractor of DOE low-level or mixed radioactive wastes for disposal at a private site."  Although correct, that does not answer the question of whether DOE *may* require a state or NRC license as part of the grounds for the contract.

Section 110 is found in Subchapter IX, Atomic Energy Licenses, which begins by stating that it is unlawful for anyone "to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, use, import, or export any utilization or production facility except under and in accordance with a license issued by the Commission."[17]  As DOE argues, it appears clear that the introductory phrase, "nothing in this subchapter," limits § 110 to production and utilization facilities.  WCS argues that such a reading renders the two subsections superfluous.  However, the second subsection addresses the "construction or operation of facilities under contact with and for the account of the Commission."  The first subsection addresses the issue the handling of "special nuclear material,"[18] focusing on activities rather than facilities.

---

[17]42 U.S.C. § 2131.

[18]"Special nuclear material" is defined as enriched plutonium or uranium.  42 U.S.C. § 2014(aa).

This interpretation is supported by NRC's regulations. The regulations provide that a contractor of the DOE is exempt from the licensing requirements "to the extent that such contractor . . . receives . . . byproduct material for: (a) The performance of work for the Department at a United States Government-owned or *controlled* site."[19] Logically, if DOE does not "control" the site, then the contractor is subject to the ordinary NRC licensing requirements.[20]

If DOE chooses to regulate, or "control", the private waste disposal sites, then the sites are exempt from NRC and state licensing requirements. Where, however, DOE does not exercise such control, the NRC and the agreement states retain their power to regulate commercial sites providing a service to DOE. Nothing in the statute indicates that DOE *must* exercise regulatory authority over such sites.

WCS directs our attention to other statutes, arguing that they indicate that DOE must facilitate competition. DOE's enabling statute, the Department of Energy Organization Act, specifies that one of the founding purposes of DOE is "[t]o

---

[19]10 C.F.R § 30.12 (1997) (emphasis added).

[20]To the extent that the statute is ambiguous on the licensing requirements, these regulations are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Granted, the NRC's interpretation does not necessarily bind the DOE. However, the same statute governs both the NRC and the DOE, and DOE has not issued any regulations on the issue prior to this litigation.

assure, to the maximum extent practicable, that the productive capacity of private enterprise shall be utilized in the development and achievement of the policies and purposes of this chapter."[21]  The overall federal procurement policy provides that, with limited exceptions, "an executive agency in conducting a procurement for property or services . . . shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter" and the Federal Acquisition Regulation.[22]  Neither of these statutes, however, direct the DOE to promote competition to the exclusion of other concerns, such as safety and state involvement.

WCS is effectively asking the courts to intrude into the agency's policy making process without a statutory basis.  We reverse the grant of the preliminary injunction and order dismissal of the suit against DOE.  The mandamus action against the trial judge based on his order that high-ranking DOE officials attend the settlement discussions is also dismissed as moot.

REVERSED.  The district court is ordered to dismiss the case.

---

[21]42 U.S.C. § 7112(14).

[22]41 U.S.C. § 253(a).