UNITED STATES of America, Plaintiff,

v.

22 RECTANGULAR OR CYLINDRICAL FINISHED DEVICES, MORE OR LESS, "THE STER–O–LIZER MD–200 * * *, ... HALOGENIC PRODUCTS COMPANY, a/k/a Ster–O–Lizer Manufacturing Company, a corporation, and Tim Themy–Kontronakis, an individual, Defendants.

Civil No. 86–C–486G.

United States District Court, D. Utah, Central Division.

June 26, 1996.

Jacqueline Eagle, Washington, DC, David J. Horowitz, Rockville, MD, for Plaintiff.

Robert L. Booker, Salt Lake City, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

J. THOMAS GREENE, District Judge.

On January 29–30, 1996, a bench trial·was held on the court's order to show cause why

defendants should not be held in criminal contempt for violation of the court's permanent injunction issued in 1989 and its Injunction Order issued in 1994. The government was represented by Jacqueline H. Eagle and David J. Horowitz. Defendants were represented by Robert L. Booker. The parties submitted evidence and presented final arguments after which the parties were permitted to file post trial memorandums. The case was submitted for decision and taken under advisement upon submission of the post trial filings.

Now being fully advised, the court makes and enters its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### Background of this Action

1. This case first came before the court on June 5, 1986, when the United States filed a civil seizure action under the Federal Food, Drug, and Cosmetic Act (the Act) against devices marketed for use in sterilizing surgical instruments (STER–O–LIZERs or sterilizers) sold by the Halogenic Products Company.

2. On July 27, 1987, the government amended the complaint to add as defendants Tim Themy–Kotronakis (Themy) and the Halogenic Products Company and to seek, in addition to the condemnation of the devices, injunctive relief against these defendants.

3. On January 12, 1989, the Court, concluding that the seized STER–O–LIZERs were devices within the meaning of the Act, 21 U.S.C. § 321(h), which were adulterated under 21 U.S.C. § 360j(f)(1)(A) and misbranded under 21 U.S.C. § 352(o), granted summary judgment to the government. *U.S. v. 22 Rectangular or Cylindrical Devices*, 714 F.Supp. 1159, 1167 (D.Utah 1989).

4. At the same time, the Court condemned the devices and ordered that an injunction issue.

### The 1989 Injunction Order

5. On March 16, 1989, the Court entered its Judgment and Decree of Condemnation and Injunction (1989 Order).

6. Paragraph IX of the 1989 Order contains the following provisions relevant to this contempt action:

IX. ... the defendants, Themy and Halogenic, and each of the corporate defendant's officers, directors, employees, agents, successors and assigns, and any and all persons in active concert or participation with them, are hereby perpetually restrained and enjoined from directly or indirectly doing any of the following acts:

A. Introducing or causing the introduction into interstate commerce of any device, or holding for sale any device after shipment of one or more of its components in interstate commerce, unless and until:

1. The methods, facilities, and controls for manufacturing, processing, packing, storing and labeling devices are established operated, and administered in conformity with FDA's Good Manufacturing Practice Regulations, 21 CFR Part 820;

.      .      .      .

3. A DHHS representative inspects the defendants' facilities.... and

4. The FDA notifies the defendants in writing that the defendants appear to be incompliance with the Good Manufacturing Practice Regulations, 21 CFR Part 820.

### The 1994 Injunction Order

7. In March 1994, the government moved this Court to reopen and modify the 1989 injunction on the grounds that Themy, now operating under the auspices of Brinecell, Inc. ("Brinecell"), was manufacturing, promoting, and actually using a new device, the AIDS Treating Machine, to treat patients.

8. In March 1994, the government gave notice and defendants consented and acquiesced therein that it intended to seek modification and to revise the 1989 injunction to make it absolutely clear that the injunction and order extends to all untested and unapproved devices produced by the defendants, including the AIDS Treating Machine. The government made it clear that it intended to seek to prohibit the defendants from distrib-

uting and holding devices for sale until they are in compliance with current good manufacturing practice [CGMP] regulations, 21 C.F.R. Part 820, and until the defendants have obtained the necessary approval from FDA.

9. On July 6, 1994, this Court signed an Injunction Order amending the 1989 injunction (1994 Order), which contains the following relevant provisions:

I. Except as explicitly stated in paragraph VI herein [providing for costs of inspections], this decree supplements but does not supersede the Order of Permanent Injunction entered in this case on March 16, 1989 ("the March 16, 1989 Order"), which Order is otherwise unaffected by this decree and remains in effect.

II. This decree applies only to articles that are intended for use, as defined in 21 C.F.R. §§ 201.128 [for drugs] and 801.4 [for devices], in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, or intended to affect the structure or function of the body of man, within the meaning of 21 U.S.C. §§ 321(g) [for drugs] and 321(h) [for devices]. Intended use under 21 U.S.C. is determined by the objective intent of the manufacturer or vendor as set forth in 21 C.F.R. §§ 201.128 and 801.4.

10. The 1994 Order enjoins the defendants from, among other things, directly or indirectly doing or causing to be done any of the following acts:

Manufacturing, processing, labeling, packing, promoting, distributing, or holding for sale the AIDS Treating Machine or any other article of device intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, or intended to affect the structure or function of the body of man, within the meanings of 21 U.S.C. § 321(h), unless and until defendants have obtained premarket approval from the FDA, as required by 21 U.S.C. § 360e, or an exemption pursuant to 21 U.S.C. § 360(g) and 21 C.F.R. Part 812. (¶ III.B)

## Order to Show Cause for Criminal Contempt

11. On June 13, 1995, the government filed a petition for an order to show cause ("petition") in criminal contempt.

12. In August 1995, the government produced more than thirteen hundred pages of discovery documents to the defendants pursuant to Fed.R.Crim.P. 16(b), and on August 10, 1995, filed its notification of compliance with D.Ut.Rule 308(h).

13. On January 5, 1996, pursuant to Fed. R.Evid. 404(b), the government served the defendants with notice of intent to offer certain evidence that might be characterized as other crimes or wrongs, including "evidence that in or about July 1994, defendant Tim Themy–Kontronakis ... promoted the sale of and offered for sale to various medical offices in Salt Lake City ... both the MD–200 Ster–O–Lizer and the AIDS Treating Machine," and evidence that after the date of entry of the first injunction (March 16, 1989), Themy continued to hold the MD–200 for sale.

14. The court executed the Order to Show Cause and set the matter for bench trial on charges of criminal contempt.

## Bench Trial on Criminal Contempt

15. After continuances, the case was finally set for trial to commence on January 29, 1996. Evidence was presented to the court on January 29–30, 1996. The following findings 16–47 are based upon the evidence presented at the said criminal contempt proceeding.

16. On May 17, 1995, Joseph Wolgramm, vice president of operations for Jets Air Freight, picked up a package from Brinecell for delivery to the Fritz Company, a freight forwarder. The package was invoiced for shipment to Barcelona, Spain, and Mr. Wolgramm delivered the package to the Fritz Company on May 17, 1995.

17. In May 1995, Dana Ferguson of the Fritz Company advised Mr. French, an FDA investigator, that Fritz had received the aforesaid package from Brinecell and that the Brinecell invoice identified the contents

as a Surgical Instrument Sterilizer model MD–200 and the destination as Barcelona, Spain. As a result, Mr. French found that the package contained a sterilizer model MD–200, and that the Brinecell invoice dated "17 May 95," listed the price for the sterilizer at $7,000.00 and was signed by Themy.

18. Thereafter, the MD–200 was administratively detained by FDA and then seized by the U.S. Marshal. Mr. French personally served Themy with copies of the administrative detention papers.

19. Prior to the aforesaid May 1995 inspection, Mr. French had inspected the Brinecell facility on three separate occasions, once in 1993, once in 1994, and once in 1995. At each inspection, Mr. French found evidence that Themy was not complying with the terms of the court issued injunctions. Specifically, Mr. French found evidence indicating that Themy was manufacturing and holding for sale both the sterilizer models MD–200 and MD–201, and the AIDS Treating Machine, and that Themy was promoting the AIDS Treating Machine. Mr. French also found during each inspection that Themy had failed to comply with CGMP requirements.

20. In the 1993 inspection, Mr. French found, and photographed, assembled sterilizers and sterilizer components at Brinecell. Themy admitted that the gauges which were assembled for his medical sterilizers came from Ohio.

21. In the 1993 inspection, Mr. French also found documents showing that Brinecell had shipped a sterilizer (priced at $1000.00) to Greece in 1992. When Mr. French asked Themy if he had shipped the sterilizer to Greece, Themy admitted that he had.

22. At the close of the 1993 inspection, Mr. French gave Themy a copy of the 1989 Injunction Order and discussed it with him. Themy agreed that he understood the requirements of the 1989 injunction and that he understood that until he complied with the requirements it contained he could not manufacture, sell or distribute any medical device as defined.

23. An inspection of the Brinecell facility was conducted by Mr. French in October 1994, after the government had sought to amend the 1989 Injunction Order and after the defendants had consented to that amendment in July 1994.

24. In his inspection of Brinecell in 1994, Mr. French found that Themy was manufacturing, holding for sale, and promoting the MD–200 sterilizer and the AIDS Treating Machine in violation of the terms of the injunction.

25. During the 1994 inspection, Mr. French found letters that post-dated the July 6, 1994 entry of the Consent Decree amending the 1989 injunction in which Themy was promoting both the AIDS Treating Machine and the MD–200 and MD–201 sterilizers. One letter to Edward A. Cerullo, dated July 25, 1994, characterizes the AIDS Treating Machine as a "multi-billion dollar making opportunity."

26. During the 1994 inspection, Themy admitted that he had shipped one AIDS Treating Machine to Canada. Mr. French expressly advised Themy that, in his view, shipment to Canada was a violation of the injunction.

27. At the close of the 1994 inspection, Mr. French gave Themy copies of both the 1989 and the 1994 Injunction Orders and discussed the injunctions with him. Themy acknowledged that he understood that the injunctive orders prevented him from manufacturing, selling, or distributing any medical devices until he complied with the injunction requirements. Mr. French also told Themy that any manufacture or promotion of the MD–200 sterilizer was in violation of the injunction.

28. In July, 1994, Joseph Cormier responded to an ad for a sales position placed by Themy in the Salt Lake Tribune on July 3, 1994, and four or five days later was hired after meeting with Themy.

29. Cormier was hired to sell the sterilizer on a commission basis. After Mr. Cormier agreed to post a surety bond Themy provided him with a sterilizer to use for demonstration during sales calls.

30. Themy tried to sell Mr. Cormier a sterilizer on a couple of occasions. Themy

told Mr. Cormier that the sterilizer was a medical device and compared it to a heart pacemaker.

31. Toward the end of July 1994, Mr. Cormier and Mr. Themy made sales calls on two physicians and a clinic. Themy made the sales presentation in each case.

32. Themy never gave Mr. Cormier a copy of either the 1989 or the 1994 Injunctions Orders, and Mr. Cormier did not learn of the injunction until he was contacted by an FDA investigator.

33. After he received copies of the Injunction Orders from an FDA investigator, Mr. Cormier confronted Themy about them, and Themy told him not to worry about them because he was "grandfathered." Themy "boasted" to Mr. Cormier that he could sell sterilizers "[a]s long as he didn't put a label on them" because "he felt he was well within the jurisdiction of the law."

34. Mr. Cormier offered to help Themy gain compliance with the requirements of the injunctions for good manufacturing practice. Themy told Cormier that compliance "did not pertain to him."

35. Prior to March 16, 1995, Themy stated in a letter written to Congresswoman Enid Waldholtz, and in an advertisement he had attempted to place in a Canadian newspaper, that he was permitted to do studies using the AIDS Treating Machine without government interference. These communications were provided to John Scharmann, the former District Director of FDA's Denver District, which encompasses Salt Lake City.

36. On March 16, 1995, Mr. Scharmann wrote to Themy about the communications and informed Themy that, under the terms of the injunction, Themy was allowed to conduct animal studies *only if* he provided the information specified in the injunction to the FDA. Mr. Scharmann also reminded Themy that contrary to his proposed ad, he was expressly enjoined from manufacturing the AIDS Treating Machine. Mr. Scharmann specifically told Themy he was enjoined:

> [f]rom manufacturing, selling and promoting the device. You are enjoined from administering or making available the AIDS Treating Machine for consumption

or use, pursuant to paragraph III.A of the decree. Furthermore, you are enjoined from distributing these articles to Canada or anywhere else under paragraph III.B and III.C of the decree.

37. On April 20, 1995, a letter from FDA's Associate Commissioner for Regulatory Affairs, Ronald Chesemore, replying on behalf of Dr. David Kessler, the Commissioner of FDA, to whom Themy had written, was sent to Themy. In that letter, Mr. Chesemore stated:

> Under the Consent Decree of Injunction ... you are expressly enjoined from conducting a clinical investigation ... relating to the AIDS Treating Machine or any device, within the meaning of 21 U.S.C. § 321(h), and from administering or making available any such device for human consumption or use, unless and until you obtain an investigational device exemption from FDA under 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812.
>
> FDA has not granted you an investigational device exemption, and the "treatments" you intend to undertake would be a clear violation of the decree, for which you may be held in civil and/or criminal contempt. I can assure you that FDA will take the steps necessary to enforce the terms of the decree.

38. Also on April 20, 1995, Themy replied to Mr. Chesemore's letter:

> What you do not state in your fax is the lives are more important than rules or regulations.
>
> . . . .
>
> IMPORTANT!!!! Your peoples in Denver stated to us that despite of the wording of your letter to me today, the FDA will not come here to attempt to stop me from treating these 3 important peoples and that I should go right ahead as planned to start tomorrow 21 April, 1995.
>
> Unless I hear otherwise from you Friday April 21, 1995, tomorrow, by fax, I am going right ahead.

39. On April 20, 1995, Mr. Scharmann received a letter by fax from Themy in which Themy stated (regarding use of the AIDS Treating Machine)

My attorney ... also told me that you told him '... we will not be there to stop him ...' meaning, that I have planned to start treating this week-end and for a 30 day period you will not come to try to stop me. If that is the case, you need not reply to this fax. Your non-reply is your promise to me that you will not bother me.

40. On April 21, 1995, Mr. Scharmann faxed a reply back to Themy, stating:

First, you must understand that no one from this office, or any other office in FDA, has given you ANY AUTHORIZATION to treat patients using the AIDS TREATING MACHINE. The government's position was made clear to you in Mr. Ronald G. Chesemore's letter to you dated April 20, 1995. The bottom-line is that you can not use the AIDS TREATING MACHINE to treat human patients for any medical purpose.

41. In reply to that communication, Themy stated, "... the proposed treatments are off for good."

42. On May 24, 1995, the FDA detained the MD–200 sterilizer which Themy had invoiced for shipment to Spain, whereupon Themy appealed the detention to Mr. Scharmann in a letter dated May 24, 1995. In his appeal, Themy stated that sending the sterilizer to Spain was "not a buy and sell transaction," and in support of that contention, Themy supplied a letter that he had faxed to the Spanish consignee on May 4, 1995, in which he had offered to sell the sterilizer for $7,000.00.

43. In 1989, Themy had submitted a premarket notification for the MD–200 Ster–O– Lizer to FDA in an attempt to establish that it was "substantially equivalent" to a "predevice amendments [pre-dating March 28, 1976] device." However, on September 13, 1989, David L. West, Deputy Director of FDA's Office of Device evaluation, notified Themy's then-attorney that the device was not substantially equivalent and was classified into class III (requiring premarket approval). Mr. West went on to state:

Any commercial distribution of this device prior to approval of a PMA [premarket application], or the effective date of any

order by the Food and Drug Administration reclassifying this device into class I or II, would be a violation of the Act. Clinical investigations of this device must be conducted in accordance with the investigational device exemptions (IDE) regulations.

\* \* \* \* \* \*

If you wish to pursue the marketing of this device or a modified device and need information or assistance in preparing PMA, IDE, or reclassification submissions, please contact the Division of Small Manufacturers Assistance at their toll free number.... If you have any questions concerning the contents of this letter including specifics concerning data requirements, please contact Tim Ulatowski at (301) 427–1225.

44. Themy made no additional submissions to FDA after 1989.

45. The petition for an order to show cause gave notice of the essential facts constituting the criminal contempt charged. The petition itself made specific reference to both the 1989 and 1994 Orders, noting that the 1994 Order supplemented but did not supersede the 1989 Order, and reiterating the pertinent provisions of the injunction orders. The government's petition provided all the particulars surrounding the shipment by the defendants of an MD–200 Sterilizer in violation of the injunction.

46. The government's petition, discovery, and Rule 404(b), Fed.R.Evid., notice clearly put the defendants on notice regarding the charges against them.

47. The 1989 and 1994 injunction orders were given to and discussed with Themy on at least two occasions, and each time he acknowledged that he understood what the orders required.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter herein.

2. Defendants have no constitutional or statutory right to a jury trial in this criminal contempt proceeding, and in any

event waived any right to a jury trial they might have had.

### No Constitutional Right to Jury Trial for Petty Offenses

■■■ The government charged this case as a petty offense. Although the Sixth Amendment and Art. III, § 2 of the United States Constitution generally provides for the right to a jury trial in criminal cases, "it has long been the rule that so-called 'petty' offenses may be tried without a jury." *Frank v. United States,* 395 U.S. 147, 148, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969), *aff'g Frank v. United States,* 384 F.2d 276 (10th Cir.1967); *see also Blanton v. City of North Las Vegas, Nevada,* 489 U.S. 538, 541, 109 S.Ct. 1289, 1292, 103 L.Ed.2d 550 (1989). "[C]riminal contempt is a petty, offense unless the punishment makes it a serious one." *Bloom v. State of Illinois,* 391 U.S. 194, 198, 88 S.Ct. 1477, 1480, 20 L.Ed.2d 522 (1968). The "severity of the penalty actually imposed" is the best indication of whether the offense is "petty" or "serious" enough to require a jury trial. *Frank,* 395 U.S. at 149, 89 S.Ct. at 1505. If "the penalty actually imposed does not exceed six months or a longer penalty has not been expressly authorized by statute," then the contempt is considered a "petty" offense. *Taylor v. Hayes,* 418 U.S. 488, 495, 94 S.Ct. 2697, 2701–02, 41 L.Ed.2d 897 (1974).

### No Statutory Right to Jury Trial for Petty Offenses

Defendants have no statutory right to a jury trial in this criminal contempt proceeding.

■■■ 21 U.S.C. § 332(b), contains a jury trial provision that states:

In the case of violation of an injunction or restraining order issued under this section, which also constitutes a violation of this chapter [the Act], trial shall be by the court, or, upon demand of the accused, by a jury.

Notwithstanding the statutory language, a contempt defendant is not entitled to a jury trial under 21 U.S.C. § 332(b) if the act of contempt charged constitutes a violation of a

court order but not a particular prohibited act under 21 U.S.C. § 331. *See United States v. Lit Drug,* 333 F.Supp. 990, 997 (D.N.J.1971) (to qualify for a jury trial, violation of court order must also "constitute[ ] an infraction of the ... Act").

In this case, the Court's orders are broader than the Act, and enjoin the defendants from committing acts relating, and leading up, to violations of the Act. *Compare* 1989 Order ¶ IX.A and 1994 Order ¶ III.B *with* 21 U.S.C. §§ 331(a)–(c), (k). Accordingly, the defendants' contemptuous acts do not "independently, constitute an offense" under the Act because the acts charged violate the Court orders but do not also constitute a violation of any particular subsection of 21 U.S.C. § 331.

### Defendant Waived any Right to Trial by Jury

■■■ In any event, a statutory right to a jury trial "upon demand" must be invoked in advance of trial. Here, defendants did not expressly demand a jury. They merely denied having waived the right to one *after* the issue was raised by the Court, and then voluntarily proceeded with a bench trial.

■■■ 3. The defendants had adequate notice of the charges against them.

This court concludes that under Fed. R.Crim.Proc. 42(b), the defendants were "fairly and completely apprised of the events and conduct constituting the contempt charged." *United States v. United Mine Workers of America,* 330 U.S. 258, 297, 67 S.Ct. 677, 697, 91 L.Ed. 884 (1947); *Yates v. United States,* 316 F.2d 718, 723 (10th Cir. 1963). *See also, United States v. Rylander,* 714 F.2d 996, 1004 (9th Cir.1983), *cert. denied* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984).

4. The 1989 and 1994 Court Orders were clear and definite.

Neither the 1989 Order nor the 1994 Order contains terms that are vague or difficult to understand. In this regard, the 1994 Order explicitly states that it "supplements but does not supersede" the 1989 Order. 1994 Order ¶ I. The 1989 Order requires, among other things, that defendants achieve compli-

ance with FDA's CGMP regulations, 21 C.F.R. Part 820, *and* receive written notification from FDA that the CGMP requirements have been met. 1989 Order ¶ IX.A.1–4.

It is manifest under the 1989 Order that until defendants achieve CGMP compliance, defendants cannot introduce or cause the introduction of devices into interstate commerce, or hold devices for sale after shipment of one or more components in interstate commerce. 1989 Order ¶ IX.A. The 1994 Order adds a number of additional requirements to those contained in the 1989 Order; including that defendants cannot manufacture, process, label, pack, promote, distribute, or hold for sale *any* device, as defined in 21 U.S.C. § 321(h), unless and until they obtain premarket approval or an investigational device exemption from FDA. 1994 Order ¶ III.B.

5 Defendants were aware of the 1989 and 1994 Court Orders.

It is clearly established that:

> "[T]he very issuance of the order puts the party on notice that his past acts have been wrongful," noting that "no concept of basic fairness is violated by requiring a person in this position to be more than normally careful in his future conduct." *United States v. Greyhound Corp.*, 508 F.2d 529, 532–33 (7th Cir.1974), *citing United States v. Custer Channel Wing Corp.*, 247 F.Supp. 481, 496 (D.Md.1965), *aff'd*, 376 F.2d 675 (4th Cir.), *cert. denied*, 389 U.S. 850 [88 S.Ct. 38, 19 L.Ed.2d 119] (1967).

Defendants were represented by counsel during the two years during which they litigated the case that led to the 1989 injunction. Also, defendants were represented by counsel when the government moved to reopen the case in 1994. Defendants received copies of the Injunction Orders and they were fully apprised of their content. Themy was reminded of the injunction orders, they were explained to him and he acknowledged that he understood the injunction orders.

■ 6. The reference to "devices" in the 1989 and 1994 Injunction Orders applies to defendants' sterilizers and AIDS Treating Machines. These are "devices" as defined by 21 U.S.C. § 321(h).

7. The Federal, Food, Drug and Cosmetic Act applies to medical devices shipped to foreign countries.

■ The Act defines "interstate commerce" as "commerce between any State or Territory and any place outside thereof." 21 U.S.C. § 321(b)(1). The Act on its face and by its plain meaning applies to foreign commerce. *United States v. 2,998 Cases*, 64 F.3d 984, 992 (5th Cir.1995). *See, e.g., United States v. Yaron Laboratories, Inc.*, 365 F.Supp. 917, 919 (N.D.Cal.1972); *Roseman v. United States*, 364 F.2d 18, 24 (9th Cir.1966), *cert. denied*, 386 U.S. 918, 87 S.Ct. 879, 17 L.Ed.2d 789 (1967). Manifestly, the Act extends to the exportation of medical devices just as it applies to domestic commerce in those articles since foreign countries clearly fall within the broad scope of "any place outside" the United States.

In addition, the Act covers a delivery for introduction into interstate commerce. *United States v. Sanders*, 196 F.2d 895, 898 (10th Cir.), *cert. denied*, 344 U.S. 829, 73 S.Ct. 33, 97 L.Ed. 645 (1952). Deliveries intended for ultimate export constitute deliveries in interstate commerce just as if such were direct shipments to a foreign country. *United States v. Eight Unlabeled Cases ... Spiced Mud–Skipper*, 909 F.Supp. 129, 131 (E.D.N.Y.1995) (quoting *Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 170–71, 43 S.Ct. 28, 30–31, 67 L.Ed. 189 (1922)).

8. The defendants wilfully disobeyed the 1989 and 1994 injunction orders.

■ It is manifest that the defendants' conduct, in holding sterilizers and AIDS Treating Machines for sale after shipment of components in interstate commerce, was intentional, and that the defendants' conduct, in causing the introduction into interstate commerce of an MD–200 sterilizer, was intentional, and that the defendants' conduct, in promoting the MD–200 and MD–201 sterilizer and the AIDS Treating Machine, was intentional. *See, United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980) (fraudulent intent may be inferred from acts and circumstances; subjective belief of defendant will

not justify baseless or reckless representations).

■ The government is not required to prove that the defendants knew they were violating the terms of the injunction when they held for sale, shipped, or promoted the devices. It need only prove that the holding, shipping, and promotion were themselves intentional. *United States v. Prugh*, 479 F.2d 611, 612 (8th Cir.1973); *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 682 (4th Cir.), *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); *see also United States v. Baker*, 641 F.2d 1311, 1317 (9th Cir.1981) (wilfulness may be inferred from admitted evidence).

9. The Defendants do not qualify for a statutory exemption to allow export.

The Act contains a statutory exemption that permits the export of adulterated and misbranded medical devices, but the defendants' devices do not meet any of the four prerequisites set forth in 21 U.S.C. § 381(e)(1).[1]

The injunction, as supplemented by consent in 1994, enjoins acts relating, and leading up to violations of the Act, including "distributing," "promoting," and "holding for sale" any medical device, until particular requirements have been met, without regard to any interstate commerce nexus.

The 1989 Injunction Order prohibits the defendants from "... holding for sale any device after shipment of one or more of its components in interstate commerce." The gauges used in all of the defendants' devices were manufactured in Ohio, so it is clear that a component of all of the defendants' devices was shipped in interstate commerce.

Defendants "held for sale" numerous medical devices by assembling and offering their devices for sale, including, but not limited to, exporting, and delivering for export, such devices.

■ 10. A corporation is guilty of criminal contempt when its agents violate a court order with knowledge that the order has been issued. *See United States v. Greyhound Corp.*, 370 F.Supp. 881 (N.D.Ill.), *aff'd*, 508 F.2d 529 (7th Cir.1974).

11. The court finds beyond a reasonable doubt that each of the defendants is guilty of criminal contempt for violation of the 1989 and 1994 Court Orders.

a. Each of the defendants violated the 1989 Order, ¶ IX.A, at a time when the defendants had never been notified by FDA that they had achieved compliance with current good manufacturing practice requirements, in a least the following particulars when they:

1) Held a sterilizer for sale after shipment of one of its components (the gauges) in interstate commerce, prior to delivering the device for shipment to Spain;

2) Caused a sterilizer to be introduced into interstate commerce by delivering the device for shipment to Spain;

3) Held for sale a sterilizer (assembled for demonstration use during sales presentations made to various medical offices in Salt Lake City) after shipment of one of its components (the gauges) in interstate commerce;

4) Held for sale the assembled sterilizers and AIDS Treating Machines that were observed during the 1994 FDA inspection of the defendants' facilities, after shipment of one of the components (the gauges) of the devices in interstate commerce.

1. The exemption states, in relevant part:
    (1) A ... device ... intended for export shall not be deemed to be adulterated or misbranded under this chapter if it—
      A) accords to the specifications of the foreign purchaser,
      B) is not in conflict with the laws of the country to which it is intended for export,
      C) is labeled on the outside of the shipping package that it is intended for export, and
      D) is not sold or offered for sale in domestic commerce. ...

    (2) Paragraph (1) does not apply to any device—
      A) which does not comply with an applicable requirement of section ...
    360e of this title [pertaining to premarket approval requirements]. unless, in addition to the requirements of paragraph (1), the Secretary has determined that the exportation of the device is not contrary to the public health and safety and has the approval of the country to which it is intended for export.
    21 U.S.C. § 381(e).

**1096**

b. Each of the defendants violated the 1994 Order, ¶ III.B, at a time when the defendants had not obtained from FDA an exemption pursuant to 21 U.S.C. § 360j(g) and 21 C.F.R. Part 812 or premarket approval as required by 21 U.S.C. § 360e, in at least the following particulars when they:

1) Distributed the sterilizer by delivering it for shipment to Spain;

2) Manufactured, processed, packed, and held a sterilizer for sale, prior to delivering it for shipment to Spain;

3) Promoted, and caused the promotion of, the sterilizer to various medical offices in Salt Lake City;

4) Manufactured, held for sale, and caused the holding for sale of, a sterilizer assembled for demonstration use during sales presentations made to various medical offices in Salt Lake City;

5) Manufactured and held for sale the assembled sterilizers and AIDS Treating Machines that were observed during the 1994 FDA inspection of the defendants' facilities, after shipment of one of the components (the gauges) of the devices in interstate commerce;

6) Promoted the AIDS Treating Machine and sterilizer by sending out promotional letters.

12. The maximum term of incarceration which the court could impose in this non-jury criminal contempt proceeding for a petty offense is six months.

13. As to the aforesaid matters, the court concludes that the defendants committed acts of criminal contempt by wilfully disobeying the 1989 and 1994 injunction orders in violation of 18 U.S.C. § 401(3). *See, United States v. Rylander,* 714 F.2d 996, 1001–02 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984); *see also Eisenberg v. University of New Mexico,* 936 F.2d 1131, 1137 (10th Cir.1991); *Yates v. United States,* 316 F.2d 718, 723 (10th Cir. 1963). A verdict and judgment should issue that the defendants are guilty of criminal contempt.

Counsel for the United States is directed to prepare and lodge with the court and serve upon defendants a form of verdict and judgment of conviction for criminal contempt as to each defendant. The court will execute the proposed verdict and judgment after approval as to form by defendants, or after 8 days from the date of service upon defendants have elapsed without approval or objection.